LARRY E. KLAYMAN (D.C. BAR NO. 334581)
KLAYMAN LAW GROUP, PA
2020 Pennsylvania Avenue NW, Suite 800
Washington, DC 20006
Telephone: 561.558.5536
Email: leklayman@gmail.com

MICHAEL D. KOLODZI (CAL. BAR NO. 255772)
THE KOLODZI LAW FIRM
433 North Camden Drive, Suite 600
Beverly Hills, California 90210
Telephone: 310.279.5212
Facsimile: 866.571.6094
Email: mdk@mdklawfirm.com

*Attorneys for Plaintiff*
KIARA ROBLES

# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KIARA ROBLES, | Case No.: 4:17-cv-04864 |
| Plaintiff, | |
| v. | **PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS FIRST AMENDED COMPLAINT** |
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, BERKELEY, et al. | |
| Defendants. | Date: September 4, 2018<br>Time: 2:30 p.m.<br>Crtrm: TBD |

Plaintiff Kiara Robles ("Plaintiff"), through her counsel Mr. Larry Klayman ("Mr. Klayman") hereby submit the following in opposition to City of Berkeley's Motion to Dismiss Plaintiff's First Amended Complaint.

**MEMORANDUM OF LAW**

**I. INTRODUCTION**

The Amended Complaint is based on the Defendants' wrongful steadfast refusal to permit speech and other expression that they do not agree with. The City of Berkeley ("Berkeley"), in concert with each and every named Defendant, has subjected UC Berkeley students and invitees who do not subscribe to the radical, left wing philosophies sanctioned by Defendants to severe violence and bodily harm for merely expressing a differing viewpoint and sexual preference, in clear contravention of their rights under the First Amendment to the U.S. Constitution. Plaintiff Kiara Robles ("Robles") just happened to be one of those individuals.

On February 1, 2017, Plaintiff Robles attended a planned speech by Milo Yiannopoulos ("Mr. Yiannopoulos"), a media personality and political commentator, hosted on the UC Berkeley campus. On the day of Mr. Yiannopoulos' speech, however, over 1,500 "protestors" gathered at UC Berkeley's Sproul Plaza and the "protestors" erupted into violence just fifteen minutes after Plaintiff's arrival onto the UC Berkeley campus. The violence was primarily orchestrated by ANTIFA and its members, in an effort to disrupt, if not kill, the event. Several people, including Plaintiff, were intentionally and violently attacked by both masked and unmasked defendant assailants, including Ian Dabney Miller and Raha Mirabdal, and the UC Berkeley campus incurred over $100,000 worth of damage. Plaintiff was attacked with extremely painful pepper spray and bear mace by masked assailants amongst the "protestors" because she chose to exercise her right to freedom of speech and show support for Mr. Yiannopoulos.

Shockingly, while Plaintiff and others were being violently attacked and assaulted by ANTIFA members, nearly 100 campus police and Defendant Berkeley police officers waited in the Student Union building, within eyesight and earshot of the violence happening outside on the alleged direction of the Defendants. They did nothing except watch the chaos and violence unfold outside. In contrast, in August of 2017, just months after the Yiannopoulos event, Berkeley "provided '500 officers' for a protest against President Trump in August of 2017." Am. Comp. ¶ 83. This dichotomy, and thus discrimination, shows a clear custom and practice by Berkeley to withhold police protection for events spotlighting viewpoints they do not agree with,

such as the Yiannopoulos event, while using their resources to ensure that events that that fall in line with their leftist viewpoints, such as an anti-Trump rally, occur without incident.

In furtherance of this patent bias against those who do not proscribe to their own ultra-leftist, radical beliefs, Berkeley, in concert with each and every named Defendant, has now directly caused the serious injuries suffered by Plaintiff and others at the Mr. Yiannopoulos event by directing and ordering the conscious withholding of police protection with the actual knowledge, if not intent, that they would be severely injured by ANTIFA rioters. This behavior is not only unconstitutional, as it effectively cuts off First Amendment rights, but is also extremely dangerous. While fortunately no one was killed by ANTIFA rioters this time, although there were serious bodily injuries to Plaintiff and others, it is only a matter of time before someone is, given that their assaults are carried out with deadly weapons, such as flagpoles. This callous, tortious, and discriminatory behavior must be put to an end, and those who have been injured, such as Plaintiff, must be given legal recourse.

Lastly, given the Court's order of June 4, 2018, holding that Plaintiff's exhaustion of administrative remedies would not be futile, Plaintiff hereby dismisses without prejudice her causes of action for Intentional Infliction of Emotional Distress and California Civil Code § 52.1 (Bane Act) – the Fifth and Eighth causes of action – against Berkeley.

**II. LEGAL STANDARD**

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To defeat a motion to dismiss under Rule 12(b)(6), a claim must contain "enough factual matter (taken as true) to suggest that an agreement was made," explaining that "[a]sking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading state; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007). The *Twombly* Court also explained, more generally, that ". . . a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," yet "must be enough to raise a right to relief above the speculative level" and give the defendant fair notice of what the claim is and the

grounds upon which it rests. *Id*. at 555. In other words, Plaintiffs here need only allege "enough facts to state a claim to relief that is plausible on its face" and to "nudge[] the[] claims[] across the line from conceivable to plausible." *Id*. at 570.

Subsequently, in *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), the U.S. Supreme Court elaborated. There, the Court held that a pretrial detainee alleging various unconstitutional actions in connection with his confinement failed to plead sufficient facts to state a claim of unlawful discrimination. The Court stated that the claim for relief must be "plausible on its face," *i.e.*, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 1949. In this regard, determining whether a complaint states a plausible claim for relief is necessarily "a context-specific task." *Id*. at 1950. Therefore, if a complaint alleges enough facts to state a claim for relief that is plausible on its face, such as here, a complaint <u>may not be dismissed</u> for failing to allege additional facts that the plaintiff would need to prevail at trial. *Twombly*, 550 U.S. at 570; *see also Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (plaintiff need not allege specific facts, the facts alleged must be accepted as true, and the facts need only give defendant "fair notice of what the *** claim is and the grounds upon which it rests" (quoting *Twombly*, 550 U.S. at 555). grounds upon which it rests" (quoting *Twombly*, 550 U.S. at 555).

Where the requirements of Rule 8(a) are satisfied, even "claims lacking merit may be dealt with through summary judgment." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002). In this regard, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at. 556. Indeed, "[t]he Federal Rules of Civil Procedure erect a powerful presumption against rejecting pleadings for failure to state a claim." *Cotrell, Ltd. V. Biotrol Int'l, Inc.*, 191 F.3d 1248, 1251 (10th Cir. 1999).

**III. THE LAW**

   **a. Plaintiff Has Adequately Stated a Claim Under *Monell***

Under *Monell v. Dept. of Social Servs. of City of New York*, 436 U.S. 658 (1978), a municipality, such as Berkeley, can be held liable if its policy or custom causes the Plaintiff a

constitutional injury. *Id*. at 691. Berkeley make no argument, nor could it, that it is not a municipality for the purpose of *Monell* liability. Indeed, Berkeley's sole argument is that Plaintiff has "failed to meet the heightened pleading standards of *Twombly*…." ECF No. 60 at 6. As set forth above, *Twombly* simply stands for the proposition that ". . . a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," yet "must be enough to raise a right to relief above the speculative level" and give the defendant fair notice of what the claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 570. Here, Plaintiff has pled facts that rise far above the "speculative level."

In *Rauen v. City of Miami*, 2007 U.S. Dist. LEXIS 14931 (S.D. Fla. Mar. 2, 2007), the Court encountered a similar factual circumstance where the city of Miami was alleged to have stifled protest in violation of the protestors constitutional rights. Importantly, the *Rauen* Court held that the Plaintiff did not need to identify any of the individual law enforcement officers, and that an allegation that Defendants "were joint tortfeasors who all contributed to Plaintiffs' injuries…" was proper. *Id*. at 12.

> Accepting Defendants' argument that Plaintiffs have failed to state a claim against any of the Defendants because of Plaintiffs' inability to identify specific officers would require the Court to dismiss Plaintiffs' case in its entirety. Such a result is clearly not in the interests of justice, for it would reward Defendants for their uniform method of dress at the FTAA, which makes it virtually impossible for an observer to identify the officers or departments behind each face shield. The undersigned therefore finds that Plaintiffs' inability to identify the specific officers involved in their alleged deprivation of rights does not mandate dismissal of any of the claims under Federal Rule 12(b)(6). *Id*. at 12-13.

The Court essentially pushed the case to discovery so that persons may be identified, which is exactly what Plaintiff is requesting here.

Furthermore, the *Rauen* Court denied dismissal of a claim for *Monell* liability where

> The TAC clearly alleges that the Municipal Defendants developed, and submitted to, several plans and agreements, the purpose of which was to stifle protest at the FTAA. It is not material that part of this policy or plan was unwritten. Moreover, the TAC asserts that the allegedly unconstitutional acts of the officers were taken in accordance with the unwritten and written plans and agreements.

This is exactly what Plaintiff here is alleging. Plaintiff alleges that, "Defendant Berkeley was acting pursuant to its policy and custom of discriminatorily and selectively providing police support and withholding police support to conservative events, rallies, and protests." Am. Comp.

¶ 82. In support of this, Plaintiff has alleged that in August on 2017, just months after the events at issue here, Berkeley provided adequate and successful police protection to an event protesting President Trump. Am. Comp. ¶ 83. Indeed, as reported by the Los Angeles Times, Berkeley provided 500 police officers for this anti-conservative, anti-Trump rally. Am. Comp. ¶ 83, Fn. 72. Not surprisingly, "Police… stepped in to halt the violence or escort the victims away from the area. Officers reported 14 arrests, many of them for violations of the city's emergency rules banning masks, sticks and potential weapons inside the demonstration area." Am. Com. ¶83, Fn. 72. "When protesters and counter-protesters arrived, they encountered a series of dump trucks lined up to form a barricade, an effort aimed at keeping a car from heading into a crowd. Marchers encountered concrete barriers at the park." Am. Comp. ¶ 83, Fn. 72. Unsurprisingly, given the strong police presence, the Anti- Trump protest did not devolve into a violent brawl.

      Again, in stark contrast, Plaintiff alleges that, during the Yiannopoulos event, which was pro-conservative and featured a known gay speaker, Berkeley law enforcement officers simply stood by idly inside of UC Berkeley's Student Union Building and watched as ANTIFA protestors violently assaulted and brutalized pro-conservative Yiannopoulos supporters, such as Plaintiff. Am. Comp. ¶ 57. Even as Plaintiff was being violently assaulted by bear mace, pepper spray, and flag poles, "there were no police officers close enough to Plaintiff Robles to protect her from her assaulter. As a result, the attackers escaped and there was no one to immediately aid Plaintiff Robles." Am. Comp. ¶ 56. Plaintiff alleges that even though Berkeley police officers could _plainly see_ pro-conservative, pro-gay attendees of the Yiannopoulos event being viciously attacked, they simply "waited in the Student Union building, yet did not act to protect any of the victims…." Am. Comp. ¶ 58. The striking discrimination between the actions (and inactions) of Berkeley when called to protect a pro-conservative and pro-gay event and the subsequent event brings the allegations that Berkeley employs a municipal custom and policy of selectively providing police protection based on politics and its own inherent biases and prejudices. It also clear that Plaintiff has suffered severe injuries as a direct result of the implementation of these customs and policies.

      Indeed, it appears that Berkeley is asking Plaintiff to show definitive evidence of its

5

1 policies and customs. This is not the proper time nor place for such a showing, as this case is still
2 in the pleading stage. Any such additional concrete evidence, other than what is already known
3 publically, of these policies and customs would surely come from Berkeley's own internal
4 memoranda and documents, to which Plaintiff has no access as of yet. As such, Plaintiff's claims
5 against Berkeley which implicate *Monell* liability must be allowed to proceed to discovery.

### b. Plaintiff Has Adequately Stated a Claim for Equal Protection

Alternatively, Berkeley argues that Plaintiff has failed to plead sufficient facts to support her claim under the Equal protection clause, once again falsely deeming Plaintiff's Amended Complaint "conclusory.

"To establish a § 1983 equal protection violation, the plaintiffs must show that the defendants, acting under color of state law, discriminated against them as members of an identifiable class and that the discrimination was intentional. The plaintiffs are members of an identifiable class for equal protection purposes because they allege discrimination on the basis of sexual orientation." *Flores v. Morgan Hill Unified Sch*. Dist., 324 F.3d 1130, 1134-35 (9th Cir. 2003). Plaintiff here has clearly met these requirements.

As set forth in the Amended Complaint, Milo Yiannopolous is a well-known gay public figure, and "Defendants chose to withhold police protection at the Milo Yiannopolous event because Milo Yiannopolous and a large number of his supporters, including Plaintiff Robles, are gay and female." Am. Comp. ¶ 96. Furthermore, "Defendants chose not to utilize their police officers to protect Plaintiff Robles at an event which they knew was to most likely become hostile and violent, because Milo Yiannopoulos and many of his supporters, including Plaintiff, are gay." Am. Comp. ¶ 100. In contrast, as set forth above, Berkeley provided "500 police officers" for an anti-conservative, anti-Trump rally, which did not feature a prominent gay speaker, and where it was certain that many of the attendees would be gay. Am. Comp. ¶ 83, Fn. 72.

Berkeley miscasts Plaintiff's Equal Protection claims as it pertains solely to her treatment compared to other attendees of the Yiannopoulos event. This is not what Plaintiff is alleging. Plaintiff is alleging that all of the attendees of the Yiannopoulos event, many of whom were gay

and women, like Plaintiff, were denied equal protection insofar as Berkeley allowed for them to be violently assaulted and attacked without intervention. In contrast, Berkeley systematically, efficiently, and successfully controlled a subsequent protest that did not feature a prominent gay speaker and whose attendees were not primarily gay and women. Am. Comp. ¶ 83.  It is clear that, in this context, Berkeley, in concert with each and every named Defendant, intentionally discriminated against Plaintiff and her fellow gay and female attendees that attended the Yiannopolous event.

### c. Plaintiff Has Adequately Stated a Claim for Violation of the First Amendment

Plaintiff is not alleging that Berkeley had an independent duty to protect her from violence as she was exercising her First Amendment right and then brutally assaulted by members of ANTIFA and other the Defendants. Instead, Plaintiff alleges that Berkeley, in concert with the other Defendants, <u>actively</u> worked together to deprive her of these rights. As set forth in the Amended Complaint, Plaintiff alleges, "Defendants [including Berkeley]—in concert with each and every named Defendant, jointly and severally—have worked in concert to deny numerous individuals who attended the Milo Yiannopolous event, including Plaintiff Robles, their constitutional right to freedom of speech and freedom of assembly, as guaranteed by the First Amendment to the U.S. Constitution." Am. Comp. ¶ 15. As part of Berkeley's role in this joint venture, "…BPD chose to withhold their aid to attendees of the Milo Yiannopolous event—in concert with each and every named Defendant, jointly and severally—including Plaintiff Robles, despite the fact that they could see attendees being viciously attacked by 'protestors.'" Am. Comp. ¶ 28.

Indeed, Berkeley tries to escape liability simply by asserting the broad generalization that the state has no duty to protect an individual against private violence. Regardless of whether this is true, it is inapplicable to the facts at bar. Here, the "state", or specifically Defendant Berkeley is actively participating in the deprivation of Plaintiff's First Amendment constitutional rights. Berkeley's motion does not address these allegations specifically, and therefore they must be treated as conceded.

### IV. CONCLUSION

As set forth in previous pleadings, ECF No. 22, this is not simply a case where a citizen is upset that she did not receive adequate provide police protection.  This  is not a case where police officers simply made a tactical error by deploying officers to the wrong location or by not deploying enough officers to appropriately oversee an event. This is a case of willful refusal to provide police protection, <u>even though they were on the scene</u>, and where Berkeley's police officers officers simply stood inside the Student Union building and watched Plaintiff and others get violently assaulted by ANTIFA rioters with deadly weapons.

To stand idly by while another individual is violently assaulted is bad enough. However, when the spectator happens to me a member of law enforcement, subject to a sworn duty to serve and protect, there must be some recourse. Law enforcement officers, and the municipalities that employ them, such as Berkeley do not enjoy the ability to perform or withhold services based on their own inherent biases and prejudices, much less work in concert with domestic terrorist groups like ANTIFA to willfully and intentionally deprive citizens of their constitutional rights. Regrettably, this is exactly what has occurred, and Plaintiff must be given legal recourse in the interest of justice and fundamental fairness.

DATED:  July 23, 2018

Respectfully submitted,
Larry Klayman, Esq.
FREEDOM WATCH, INC.
2020 Pennsylvania Ave N.W. #345
Washington, D.C. 20006
Tel: (561) 558-5336

Michael D. Kolodzi
THE KOLODZI LAW FIRM
433 North Camden Drive, Suite 600
Beverly Hills, California 90210
Telephone: 310.279.5212
Facsimile: 866.571.6094
Email: mdk@mdklawfirm.com

*/s/ Larry Klayman*
LARRY KLAYMAN, ESQ.
Attorneys for Plaintiff
KIARA ROBLES