1  Farimah Brown, City Attorney, SBN 201227
   Lynne S. Bourgault, Deputy City Attorney, SBN 180416
2  Jessica Mar, Deputy City Attorney, SBN 293304
   BERKELEY CITY ATTORNEY'S OFFICE
3  2180 Milvia Street, Fourth Floor
   Berkeley, CA 94704
4  Telephone: (510) 981-6998
   Facsimile: (510) 981-6960
5  Email: LBourgault@cityofberkeley.info

6  Attorneys for Defendant CITY OF BERKELEY

7

8              UNITED STATES DISTRICT COURT

9          FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11  KIARA ROBLES,                          No. 4:17-cv-04864 CW

12              Plaintiff,

13  v.                                      **SUPPLEMENTAL DECLARATION OF
                                            LYNNE BOURGAULT IN SUPPORT OF
14  IN THE NAME OF HUMANITY, WE             MOTION TO REVOKE PRO HAC VICE
    REFUSE TO ACCEPT A FASCIST             ADMISSION OF LARRY KLAYMAN**
15  AMERICA (a.k.a. ANTIFA), CITY OF
    BERKELEY, ET AL.,                       Date:  UNDER SUBMISSION
16                                          Time:  N/A
                Defendants.
17

18       I, LYNNE BOURGAULT, declare as follows:

19       1.      I am a Deputy City Attorney for the City of Berkeley, and attorney for defendant

20  City of Berkeley in this action. I am licensed to practice law in the State of California and have

21  been admitted to practice in this Court. I have personal knowledge of all the facts stated in this

22  Declaration and I am competent to testify to these facts if called on to do so.

23       2.      Attached hereto as Exhibit 1 is a true copy of the Brief of Disciplinary Counsel

24  filed in the Matter of Larry E. Klayman, Esquire, Disciplinary Docket No. 2008-D048, District

25  of Columbia Court of Appeals, on June 11, 2018.

26       3.      Attached hereto as Exhibit 2 is a true copy of pages 1 through 24 of the

27  Complaint filed in *Klayman v. Hamilton Fox, et. al.*, District of Columbia Case No. 1:18-cv-

28

                                        1

1  01579-RDM, ECF Doc. # 1.  The exhibits to the Complaint (pages 25 – 98) have been omitted

2  but are publicly available on Pacer.

3       I declare under penalty of perjury under the laws of the State of California and the United

4  States of America that the foregoing is true and correct.

5       Executed on July 27, 2017 in Berkeley, California.

6                                                    /s/
                                              Lynne S. Bourgault
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Supplemental Declaration of Lynne Bourgault ISO Motion to Revoke Pro Hac Vice Status
Case No. 4:17-cv-04864 - CW

# EXHIBIT "1"



DCCA No. 18-BG-100

## DISTRICT OF COLUMBIA
## COURT OF APPEALS

Clerk of the Court
Received 06/11/2018 04:06 PM
Resubmitted 06/11/2018 04:14 PM
Resubmitted 06/11/2018 04:24 PM
Filed 06/11/2018 04:24 PM

In the Matter of                    :
                                    :
**LARRY E. KLAYMAN, ESQUIRE,**       :    Disciplinary Docket No. 2008-D048
(Bar Registration No. 334581)        :
                                    :
Respondent                          :
                                    :

---

## BRIEF OF DISCIPLINARY COUNSEL

---

Elizabeth A. Herman
Deputy Disciplinary Counsel
Bar Registration No. 940254

Jennifer P. Lyman
Senior Assistant Disciplinary Counsel
Bar Registration No. 272138

*H. Clay Smith, III
Assistant Disciplinary Counsel
Bar Registration No. 384876

Office of Disciplinary Counsel
515 5th Street, N.W.
Building A, Room 117
Washington, D.C. 20001
(202) 638-1501

*H. Clay Smith, III, will present
argument on behalf of Disciplinary Counsel

*In re Larry E. Klayman, Esquire*
DCCA No. 18-BG-100

Certificate Required by Rule 28(a)(1) of
the Rules of the District of Columbia
Court of Appeals

The undersigned, counsel of record for the Office of Disciplinary Counsel, certifies that

the following listed parties appeared below:

Larry E. Klayman, Esquire, Respondent
Stephen A. Bogorad, Esquire, Counsel for Respondent

H. Clay Smith, III, Assistant Disciplinary Counsel
The Office of Disciplinary Counsel

These representations are made in order that judges of this Court, *inter alia*, may evaluate

possible disqualification or recusal.

H. Clay Smith, III
Attorney of Record for
the Office of Disciplinary Counsel

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. v

JURISDICTIONAL STATEMENT ........................................................................... vii

STATEMENT OF ISSUES PRESENTED ................................................................ vii

INTRODUCTION AND SUMMARY OF ARGUMENT ........................................... 1

STATEMENT OF THE CASE ..................................................................................... 3

STATEMENT OF THE FACTS .................................................................................. 4

STANDARD OF REVIEW ........................................................................................... 9

ARGUMENT ................................................................................................................ 10

    A.   THE BOARD CORRECTLY FOUND MR. KLAYMAN VIOLATED RULE 1.9 OF THE D.C. AND FLORIDA RULES BY REPRESENTING CLIENTS IN MATTERS THAT WERE THE SAME OR SUBSTANTIALLY RELATED TO MATTERS HE HANDLED FOR HIS FORMER CLIENT, JUDICIAL WATCH......... 10

    B.   THE BOARD ERRED BY OVERTURNING THE HEARING COMMITTEE'S CONCLUSION THAT MR. KLAYMAN VIOLATED RULE 8.4(d) WHEN HE APPEARED ON BEHALF OF PETER PAUL WITH A "CLEAR CONFLICT OF INTEREST" AND LITIGATED AGAINST DISQUALIFICATION FOR THE SECOND TIME. ......................................................................................................... 12

    C.   THE HEARING COMMITTEE'S FACT-FINDINGS ABOUT MR. KLAYMAN'S CREDIBILITY AND FALSE TESTIMONY WERE SUPPORTED BY SUBSTANTIAL RECORD EVIDENCE AND ENTITLED TO DEFERENCE. ........................................................................................................ 14

    D.   THE BOARD'S RECOMMENDED SANCTION, OMITTING A FITNESS REQUIREMENT BEFORE REINSTATEMENT, IS UNWARRANTED, BECAUSE THE BOARD ERRED IN REJECTING THE HEARING COMMITTEE'S FACT-FINDINGS AND ITS SERIOUS DOUBT AS TO MR. KLAYMAN'S LIKELIHOOD OF FUTURE COMPLIANCE WITH HIS ETHICAL OBLIGATIONS............................................................................................ 20

CONCLUSION ............................................................................... 23

CERTIFICATE OF SERVICE ....................................................... 24

## TABLE OF AUTHORITIES

**Cases**

*Brown v. District of Columbia Board of Zoning Adjustment*, 486 A.2d 37 (D.C. 1984)
    (en banc) ................................................................................................................ 10
*Derrickson v. Derrickson*, 541 A.2d 149 (D.C. 1988)................................................... 11
*In re Anderson*, 778 A.2d 330 (D.C.2001) ...................................................................... 9
\* *In re Bradley*, 70 A.3d 1189 (D.C. 2013) (per curiam)........................................... 9, 16
\* *In re Cater*, 887 A.2d 1 (D.C. 2005)......................................................................... 21
*In re Chisholm*, 679 A.2d 495 (D.C. 1996) .................................................................. 21
*In re Cleaver-Bascombe*, 892 A.2d 396 (D.C. 2006) ............................................... 9, 23
*In re Cleaver-Bascombe*, 986 A. 2d 1191 (D.C. 2010) ................................................. 10
*In re Cole*, 967 A.2d 1264 (D.C. 2009) ........................................................................ 12
*In re Downey*, 162, 168-69 (D.C. 2017) ........................................................................ 16
*In re Fay*, 111 A.3d 1025 (D.C. 2015) (per curiam) ..................................................... 11
\* *In re Hopkins*, 677 A.2d 55 (D.C. 1996) ................................................................... 12
*In re Jones-Terrell*, 712 A2d 496 (D.C. 1998) ............................................................ 20
*In re Micheel*, 610 A.2d 231 (D.C.1992)........................................................................ 9
*In re Ontell*, 593 A.2d 1038 (D.C. 1991)........................................................................ 3
*In re Pearson* Bar Docket No. 2007-D149, BPR No. 15-BD-031 ............................... 16
*In re Schwartz*, Bar Docket No. 2009-D148 (BPR, July 31, 2017),
    pending Court review, DCCA No. 17-BG-1053 ......................................................... 16
*In re Shay*, 756 A.2d 465 (D.C. 2000) ......................................................................... 20
*In re Sneed*, 673 A.2d 591 (D.C. 1996) .......................................................................... 9
*In re Steele*, 630 A.2d 196 (D.C. 1993) ....................................................................... 21
*In re Thompson*, 583 A.2d 1006 (D.C. 1990) ................................................................. 9
*Rombola v. Botchey*, 149 So.3d 1138 (Fla. 2014) ....................................................... 11
*State Farm Mut. Auto Ins. Co. v. K.A.W.*, 575 So.2d 630, 633-634 (Fla. 1991)........... 11
*T.C. Theatre Corp. v. Warner Brothers Pictures*, 113 F. Supp. 265 (S.D.N.Y. 1953).......... 10
*In re White*, 11 A 3d 1226 (D.C. 2011) .................................................................. 13, 14

**Rules**

D.C. Bar Rule XI § 9(e) ................................................................................................ vi
Rule 1.9 .................................................................................................... passim
Rule 4-1.9............................................................................................ 1, 3, 10, 12
Rule 7.16(a).................................................................................................................. 3
Rule 8.4(d) ............................................................................................... passim
Rule 8.5(b)(1)............................................................................................................. 12

**Other Authorities**

Supreme Court Case No. SC11-247, dated August 11, 2011 ........................................................... 4

*Denotes cases chiefly relied upon.

Board on Professional Responsibility ("Board" or "BPR") agreed that in all three cases, Mr. Klayman violated the Rules proscribing conflicts of interest in pursuing a "vindictive" crusade against his former client. Calling it a "close question," however, the Board overturned the Committee's conclusion that Mr. Klayman violated Rule 8.4(d) by undertaking the third conflicted representation and requiring his former client to litigate its second disqualification motion, and the U.S. District Court to consider and grant the motion. The Board also rejected the Committee's credibility finding as to Mr. Klayman's dishonesty in testimony and briefing. The Board recommended that Mr. Klayman be suspended from the practice of law for ninety days, but without those underpinnings it declined to recommend requiring proof of fitness to practice before reinstatement.

From July 1994 through September 2003, Mr. Klayman served as the General Counsel for Judicial Watch. He functioned as the organization's lead attorney, supervised all lawyers employed by the organization and provided advice on all in-house issues affecting the organization. In this capacity, he provided legal advice to Judicial Watch about (1) an in-house personnel issue involving Sandy Cobas; (2) fundraising and soliciting charitable contributions for its building fund, including making a personal solicitation to Louise Benson for a substantial donation; and (3) drafting, editing and executing legal representation agreements between Judicial Watch and Peter Paul.

Mr. Klayman separated from Judicial Watch in September 2003 on acrimonious terms. He thereafter represented Ms. Cobas in suing Judicial Watch for damages, based on the same personnel issue Mr. Klayman had advised the organization to resolve while he served as General Counsel. Mr. Klayman also represented Ms. Benson, in suing Judicial Watch for failing to live up to the promises he made to secure her donation. Finally, Mr. Klayman represented Mr. Paul

in a civil action against Judicial Watch, for breaching the very legal representation agreements Mr. Klayman drafted, edited, and executed on behalf of the organization. Mr. Klayman never sought a waiver of the conflicts from his former client, which twice moved to disqualify him from the relevant representation.

## STATEMENT OF THE CASE

Disciplinary Counsel filed a specification of charges in October 2013.   HCR 2.[1] Respondent answered, admitting most of the factual allegations and posing nine "affirmative defenses." *Id.* A Hearing Committee approved an amended specification, substituting the Florida Rule 4-1.9(a) charge for the D.C. Rules charge in relation to the Cobas matter. The disciplinary case subsequently was assigned to Hearing Committee Number Nine; Mr. Klayman moved to strike or dismiss Count I of the Amended Specification and the Committee deferred ruling, consistent with Board Rule 7.16(a); it later recommended denying the motion. HCR 4-5. *See In re Ontell,* 593 A.2d 1038, 1040 (D.C. 1991). The Committee heard the case January 26-28, 2016 with Disciplinary Counsel represented by H. Clay Smith III, Esq., and Respondent appearing *pro se.* Disciplinary Counsel called one witness -- Thomas Fitton, the President of Judicial Watch -- and submitted exhibits DX A-D and 1-52, which were admitted into evidence.   HCR 3. Mr. Klayman testified on his own behalf, called three other witnesses -- Paul Orfanedes, Esq., Judge Royce C. Lamberth, and an expert, Professor Ronald Rotunda – and submitted exhibits RX 1-26, which were admitted into evidence. *Id.* Disciplinary Counsel called Daniel Dugan, Esq. in rebuttal. *Id.*

The Hearing Committee preliminarily determined that Disciplinary Counsel had proved

---

[1]     "HCR" refers to Hearing Committee Number Nine's report and recommendation filed June 19, 2017; Tr. ___ refers to the transcript of the hearing January 26-28, 2016; Disciplinary Counsel's exhibits are designated "DCX"; Respondent's exhibits are designed RX; "Bd. Rpt." refers to the report and recommendation of the Board filed February 6, 2018.

at least one violation in the amended specification, the premise for hearing evidence in mitigation or aggravation of sanction. *Id.* The Committee then accepted Disciplinary Counsel's additional exhibit – a Florida Consent Judgment against Mr. Klayman in (Florida) Supreme Court Case No. SC11-247, dated August 11, 2011, admitted as DX 53. At the end of the hearing, the parties agreed to a joint stipulation settling a number of facts. Thereafter Judge Lamberth wrote to Disciplinary Counsel about his testimony, attaching a document admitted in the Paul case. The Hearing Committee granted Mr. Klayman's unopposed motion to add the note and its attachment to the record. HCR 4.

The Committee issued its report on June 19, 2017, recommending that Mr. Klayman be suspended for ninety days with his reinstatement conditioned upon a showing of fitness, for engaging in a conflict of interest in the three separate matters, and engaging in conduct that seriously interfered with the administration of justice, with his conduct aggravated by his dishonesty in testimony and briefing. HCR. Mr. Klayman filed an exception to the Committee's report.

After briefing and oral argument, the Board issued its report and recommendation on February 6, 2018. Mr. Klayman did not file an exception. Disciplinary Counsel filed a general exception to the Board's report and recommendation on February 12, 2018.

## STATEMENT OF THE FACTS

The Board found that the Committee's findings of fact were supported by substantial evidence in the record and it adopted them, with the exception of the Committee's finding that Mr. Klayman testified falsely at the hearing. Bd. Rpt. at 2, 16-17. Disciplinary Counsel summarizes the Board and Hearing Committee fact findings together below, separately describing the findings about Mr. Klayman's hearing testimony and briefing representations. *See*

4

HCR 6-15, 29-30, 37-38, 41.

The Hearing Committee found that Mr. Klayman served Judicial Watch as its "lead attorney" in his role as General Counsel, between 1994 and September, 2003. He "vet[ted] and analyz[ed] the advice of outside counsel" (*id.*) and the Board found in employment matters specifically, Judicial Watch relied on Mr. Klayman for legal advice (Bd. Rpt. 3). In 2003, Sandra Cobas, the director of the group's Miami regional office, complained of harassment by another employee, and Mr. Klayman "advised Judicial Watch's management to take action against [the] other employee." Bd. Rpt. 3; HCR 7. Mr. Klayman and Ms. Cobas both left Judicial Watch thereafter, in September, 2003. The Hearing Committee found Mr. Klayman departed with a severance agreement, but that he soon fell out with the organization's leaders. HCR 7. It pointed to Mr. Klayman's testimony that "Judicial Watch was his 'little baby'" and that its leadership misused the organization and betrayed him after he left. *Id.* The resulting acrimony lead Mr. Klayman to sue the organization "approximately seven times" by the date of the hearing. *Id.*

Shortly after both Mr. Klayman and Ms. Cobas left Judicial Watch, she sued the organization in state court, based on the same "hostile work environment" she had complained about to Mr. Klayman, when he was General Counsel. Bd. Rpt. 3; HCR 8. The Florida trial court dismissed Ms. Cobas's complaint, calling it "silly and vindictive." HCR 8. Without seeking consent from Judicial Watch, Mr. Klayman then entered an appearance on her behalf and moved to vacate the dismissal. *Id.* When the trial court denied his motion, Mr. Klayman appealed on Ms. Cobas's behalf, but the appellate court summarily affirmed. HCR 8-9; Bd. Rpt. 3.

Louise Benson's case grew out of a fundraising campaign undertaken by Judicial Watch

starting in 2002. Although Mr. Klayman claimed he acted as "Chair" of Judicial Watch, not General Counsel, during the building campaign, the Committee found Mr. Klayman "not credible" in denying he gave legal counsel on the matter. HCR 9 n. 3. The Board also noted that letters and solicitations for funds specifically identified him in his General Counsel role, and the organization "relied on [him] as its general counsel to protect its interests." Bd. Rpt. 4. In response, Louise Benson pledged $50,000, of which she paid $15,000. Id.

Judicial Watch did not buy a headquarters building. Three years after he left the organization, Mr. Klayman joined Ms. Benson in suing Judicial Watch in federal court. Daniel Dugan represented both litigants. HCR 10. Ms. Benson made various claims based on Judicial Watch's failure to use her money for buying a building, while Mr. Klayman's claims related to his severance. Id. When the District Court dismissed Ms. Benson's claims for falling short of the jurisdictional amount required for a federal case, she turned around and sued in the District of Columbia Superior Court. Mr. Dugan also represented her in that case and listed Mr. Klayman as a fact witness, based on his statements during the fundraising. HCR 11. Judicial Watch repaid Ms. Benson her $15,000, but she continued litigating and Mr. Klayman entered his appearance as her "co-counsel" with Dugan. Id; Bd. Rpt. 4. He rejected Judicial Watch's request that he withdraw based on Rule 1.9 (former client conflict). Judicial Watch then moved to disqualify him.

The response to Judicial Watch's disqualification motion became a significant issue at the disciplinary hearing. Both Mr. Klayman's and Mr. Dugan's electronic signatures appeared on Ms. Benson's response, accompanied by Ms. Benson's affidavit claiming, "[t]he source and substance of my allegations against Judicial Watch do not involve Larry Klayman, other than that he acted as my counsel at all relevant times." HCR 12 (record citation omitted). At the

disciplinary hearing, Mr. Klayman testified that Mr. Dugan wrote the response and advised Mr. Klayman to file it – "I believed that Mr. Dugan had given the advice of counsel that I could do this, otherwise he wouldn't have prepared the pleading." *Id.* (citing Tr. 359 and *see also, e.g.,* Tr. 358, 409). Mr. Dugan testified otherwise in rebuttal: "I was not asked for, nor did I give my advice, as to whether Mr. Klayman should enter his appearance on behalf of Louise Benson." *Id.* (citing Tr. 685-686).

The Committee resolved the conflicting accounts by crediting Mr. Dugan and finding "[Mr. Klayman's] testimony was false." *Id.* It concluded that: 1) Mr. Klayman could not have "inferred the advice from Dugan's brief opposing the motion to disqualify because Dugan did not write the opposition;" 2) Mr. Dugan thought Judicial Watch's disqualification motion was "well founded;" and 3) Mr. Klayman wrote the opposing brief himself. HCR 13 (citing Tr. 682, 683-684 and *see also* Tr. 691-692). The parties dismissed Ms. Benson's case by stipulation in August, 2007, before the trial court ever ruled on the disqualification motion. *Id.* (citing DX 34); Bd. Rpt. 4.

The Board made no independent findings of historical fact relating to this first disqualification motion. The Board's own account of the facts did not mention the conflicting testimony (Bd. Rpt. 4), although it began by finding the Committee's fact-findings supported by substantial evidence "with the exception of its finding that [Mr. Klayman] gave false testimony during the hearing" (Bd. Rpt. 2 (citing its discussion at 16)). While discussing sanction, however, the Board made conclusions on that subject that are addressed in the Sanction argument below. (*See infra.* at 14-19).

Six months after the *Benson* dismissal, Mr. Klayman again entered a case against Judicial Watch without its consent, noting his appearance in March, 2008 on behalf of Peter Paul in U.S.

District Court for the District of Columbia.  Bd. Rpt. 5; HCR 15 (citing DX 47).  As General Counsel for Judicial Watch, Mr. Klayman had signed successive agreements for the organization to represent Mr. Paul in various criminal and civil proceedings. Bd. Rpt. 5; HCR 14-15.  Judicial Watch withdrew from those representations, with court approval, after Mr. Klayman left. HCR 14; Bd. Rpt. 5.

Represented by Mr. Dugan, Mr. Paul then sued Judicial Watch for breach of the contracts drafted by Mr. Klayman.  *Id.*  When Mr. Klayman entered his appearance in *that* case, Judicial Watch again moved for his disqualification.  *Id.*  Mr. Klayman opposed the motion, after three motions for extensions of time.  HCR 35; Bd. Rpt. 12 n. 7.  The District Court, Judge Royce Lamberth presiding, granted the disqualification motion.  HCR 15; Bd. Rpt. 5.  It found Mr. Klayman's representation of Mr. Paul a "clear violation of Rule 1.9" because it was "the very type of 'changing sides in the matter' forbidden" by the Rule.  HCR 15 (quoting Judge Lamberth's 15-page written Order of July 16, 2008, DX 52 at 558).  The Board quoted the same passages.  Bd. Rpt. 15.  It reported the judge saw "some ambiguity in the case law as to the standard for disqualification" (Bd. Rpt. 5, citing the exhibit "at 5-15"), apparently referring to the Court's final footnote – at 14 n. 3 -- saying the court need not decide whether Rule 1.9 *"requires disqualification or merely provides a sufficient basis for a District Court's decision."* DX 52 at 558 n. 3.  The Board did *not* quote the Judge's last sentence before its Conclusion, rejecting the claim of a "hardship" to Mr. Paul by saying, "The Court simply cannot condone such a flagrant violation of a Rule of Professional Conduct essential to the proper functioning of our system of justice." DX 52 at 558.

## STANDARD OF REVIEW

D.C. Bar Rule XI § (h)(1) provides:

> [T]he Court shall accept the findings of fact made by the Board unless they are unsupported by substantial evidence in the record and shall adopt the recommended disposition of the Board of the Board unless to do so would foster a tendency toward inconsistent dispositions for comparable conduct or would otherwise be unwarranted.

*See also In re Sneed,* 673 A.2d 591, 593 (D.C. 1996).  "Substantial evidence means enough evidence for a reasonable mind to find support for the conclusion reached." *In re Thompson,* 583 A.2d 1006, 1008 (D.C. 1990).  The Board "has the power to make its own factual findings," but it "must accept the Hearing Committee's evidentiary findings, including credibility findings, *if* they are supported by substantial evidence in the record." *In re Bradley,* 70 A.3d 1189, 1193 (D.C. 2013) (quoting and adding its own emphasis to *In re Cleaver–Bascombe,* 892 A.2d 396, 401 (D.C.2006)).  In *Bradley* the Court noted the "considerable deference [accorded] to credibility findings by a trier of fact who has had the opportunity to observe the witnesses and assess their demeanor," but that, on occasion, a reviewing body might examine the evidence that "detracts" from those findings. *Id.* at 1193-94.  The Court elaborated, saying:

> [T]he Board and Court owe no deference to the Hearing Committee's determination of "ultimate facts," which are really conclusions of law and thus are reviewed *de novo. See In re Anderson,* 778 A.2d 330, 339 n. 5 (D.C.2001). "Ultimate facts" are those that have a clear "legal consequence." *See In re Micheel,* 610 A.2d 231, 235 (D.C.1992). Whether respondent gave sanctionable false testimony before the Hearing Committee is a question of ultimate legal fact that the Board and this court review *de novo.*

*Id.* at 1194.  Where reviewing "ultimate facts" *de novo,* the Court nevertheless must accept the "subsidiary findings of basic facts, which include such things as credibility determinations made by . . . (the Hearing Committee)." *In re Micheel,* 610 A.2d 233.

As to sanction, the Court uses the standard set out in D.C. Bar Rule XI § (h)(1), with the

additional recognition that it bears ultimate responsibility for "the system of attorney discipline, including the imposition of sanctions," and when it "disagrees with the Board as to the seriousness of the offense or the demands of consistency" it gives less weight to the Board's recommendations. *In re Cleaver-Bascombe*, 986 A. 2d 1191, 1195 (D.C. 2010) (internal quotations and citations omitted).

## ARGUMENT

**A.   THE BOARD CORRECTLY FOUND MR. KLAYMAN VIOLATED RULE 1.9 OF THE D.C. AND FLORIDA RULES BY REPRESENTING CLIENTS IN MATTERS THAT WERE THE SAME OR SUBSTANTIALLY RELATED TO MATTERS HE HANDLED FOR HIS FORMER CLIENT, JUDICIAL WATCH.**

With little dispute about the facts, the Board on Professional Responsibility agreed with the Hearing Committee that Mr. Klayman represented three clients whose interests were "materially adverse" to Judicial Watch, in matters that were "the same" or "substantially related" to work he had done when Judicial Watch was his client and thus violated Rule 1.9 and Florida's Rule 4-1.9. Bd. Rpt. 6-12. Rule 1.9 provides:

> A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent. [2]

According to Comment [2], "Rule 1.9 is intended to incorporate District of Columbia and federal case law defining the 'substantial relationship' test. *See, e.g., Brown v. District of Columbia Board of Zoning Adjustment*, 486 A.2d 37 (D.C. 1984) (*en banc*); *T.C. Theatre Corp. v. Warner Brothers Pictures*, 113 F. Supp. 265 (S.D.N.Y. 1953), and its progeny." Comment [3]

---

[2]   Florida's virtually identical Rule 4-1 of the RRFB (amended 2010) provides:

A lawyer who has formerly represented a client in a matter shall not thereafter:

(a)   represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent.

adds that "[m]atters are 'substantially related' for purposes of this rule if they involve the same transaction or legal dispute."[3]

The Board observed -- as did Judge Lamberth in his Order disqualifying Mr. Klayman from the *Paul* matter – that Rule 1.9 protects clients against the possibility their lawyers will use their confidences to gain advantage over them in later proceedings. Bd. Rpt. 6. "The solicitude for the duty of confidentiality is so strong that where 'two matters, handled by the same counsel, are substantially related, there is an *irrebuttable presumption* that counsel received information during the first representation that is relevant to the second.'" *Id.* (quoting *Derrickson v. Derrickson*, 541 A.2d 149, 152 (D.C. 1988) with its original emphasis; additional citations omitted). *See also* BX 52 at 557 (Judge Lamberth's Order citing *Derrickson* and noting the presumption of taint from switching sides in substantially related matters reflects the potential for misuse of confidential information obtained from the former client).[4]

Using this Court's "totality of the circumstances" test, the Board concluded Mr. Klayman served Judicial Watch as its lawyer in all three matters. Bd. Rpt. 8-10 (citing *In re Fay*, 111 A.3d 1025, 1030 (D.C. 2015) (*per curiam*). It also agreed with the Committee that the matters in question were the same or related to his Judicial Watch work and "the relationship was not only substantial, but direct and obvious." Bd. Rpt. 11; HCR 20. Given that Mr. Klayman never asked for consent from Judicial Watch to undertake these matters, he violated Rule 1.9 in the *Benson*

---

[3]     Comments [2] and [3] to RRFB, while different in some respects, nonetheless repeat substantially verbatim, the text of Comments [2] and [3] to D.C.'s Rule 1.9.

[4]     Florida courts follow the same rule. According to the Florida Supreme Court, the presumption that clients' confidences are shared with their attorneys exists because of the "difficulty of proving that confidential information useful to the attorney's current client was given to the attorney." *Rombola v. Botchey*, 149 So.3d 1138, 1144 (Fla. 2014) (quoting *State Farm Mut. Auto Ins. Co. v. K.A.W.*, 575 So.2d 630, 633-634 (Fla. 1991)). The Florida Supreme Court also recognized that rule protects the former client from disclosure of confidences. *Id.* (*State Farm*).

and *Paul* matters and Florida Rule 4-1.9(a) in the Cobas matter.  Bd. Rpt. 11 n. 6 (citing Rule 8.5(b)(1) concerning application of Florida Rules to a matter pending in that state's courts).

**B.**     **THE BOARD ERRED BY OVERTURNING THE HEARING COMMITTEE'S CONCLUSION THAT MR. KLAYMAN VIOLATED RULE 8.4(d) WHEN HE APPEARED ON BEHALF OF PETER PAUL WITH A "CLEAR CONFLICT OF INTEREST" AND LITIGATED AGAINST DISQUALIFICATION FOR THE SECOND TIME.**

The Hearing Committee correctly concluded Mr. Klayman "violated Rule 8.4(d) by entering his appearance and litigating disqualification in the Paul matter, thereby engaging in conduct that . . . (1) was improper; (2) bore directly upon the judicial process with respect to an identifiable case or tribunal; and (3) tainted the judicial process in more than a *de minimis* way . . . ." HCR 34 (citing *In re Hopkins,* 677 A.2d 55, 60-61 (D.C. 1996)).  The Committee noted the "taint" described in *Hopkins* need only "potentially" have had a serious and adverse impact upon the process, and that an "attorney violates the rule *when his improper conduct causes the unnecessary expenditure of time and resources in a judicial proceeding.*" *Id.* (citing *In re Cole,* 967 A.2d 1264, 1266 (D.C. 2009)) (emphasis added).

The conflict of interest in *Paul* "could not have been clearer," and the Committee said Mr. Klayman knew Judicial Watch would oppose his appearance, based on what already had happened in the *Benson* matter.  HCR 34-35.  The Committee reviewed Mr. Klayman's entire course of conduct surrounding his entry of appearance in the Paul case, including his three extensions of time to oppose the disqualification motion and his "strident" but legally baseless arguments (leading to Judge Lamberth's 14-page written order).  HCR 35.  It also pointed to the fact that he "further wasted judicial resources by filing a notice of appeal, which was ultimately dismissed for want of prosecution." *Id.* (citing docket entries).

The Board cited *Hopkins* and quoted the standard.  Bd. Rpt. 12.  It agreed with the

Committee that Mr. Klayman's conduct met the first two elements – improper conduct with respect to a specific case. Bd. Rpt. 13. Finding the question "close," however, the Board concluded the conduct did not "unacceptably 'taint[]' the *Paul* case." *Id.* The Board appeared to lose sight of the Court's point in *Hopkins* that *potential* taint satisfies the standard, and the additional point in *Cole* that "taint" includes "unnecessary expenditure of time and resources in a judicial proceeding."

Remarking that it has "long been concerned about the scope of Rule 8.4(d) in litigation-related disciplinary matters," the Board emphasized its own report in *In re White*, where it decried a possible "pernicious effect on the administration of justice" if lawyers withdrew to avoid exposure to discipline. Bd. Rpt. 13-15 (citing *In re White*, 11 A 3d 1226, 1247 (D.C. 2011) (appended Board Report)).[5] The Court, however, concluded that White *did* violate Rule 8.4(d) by representing a client in an employment discrimination case adverse to the government agency where she previously had supervised an investigation of the same case. The Court specifically disavowed the Board's concern over a "pernicious effect" of such disciplinary actions. 11 A.3d at 1231.

The Board emphasized that the Court in *White* "did not find the Rule 8.4(d) violation based on the disqualification alone" Bd. Rpt. 14. On that basis, the Board took the position that a Rule 8.4(d) violation in this case "would be premised solely upon the Rule 1.9 conflict and disqualification" and thus "would be derivative of the conflict of interest finding." *Id.* It accorded "extra significance" to Judge Lamberth's testimony (*id.*), which consisted largely of

---

[5]     Mr. Klayman's arguments, and the Paul record documents reflect concern over Mr. Paul's dearth of resources to fund his litigation. *See, e.g.* (Lamberth post-hearing letter). Many litigants and would-be-litigants, of course, lack resources to pay lawyers. But Rule 1.9 makes no exception to the protection offered to former clients, if their adversaries cannot afford litigation expenses. In other words, the Rule affords no "safe harbor" from conflicts of interest to lawyers for attacking their former clients on behalf of impecunious litigants.

explaining that he had not referred Mr. Klayman to Disciplinary Counsel because he thought his strongly worded opinion would serve as a kind of "public reprimand" and ensure Mr. Klayman "understood the Court's view of the disqualification" (Tr. 658-59).

In essence, the Board tried to negate the Court's decision in *White*. *In re White*, 11 A.3d at 1228. The Rule violation in *White* encompassed the lawyer's conduct surrounding her involvement in the case and thus rested "not only [on] the outcome of the disqualification motion, but also the nature of the misconduct that led to the filing of the motion to disqualify and the related misconduct . . . ." 11 A.3d at 1231. Similarly, Mr. Klayman's violation rested on all of his "related misconduct" in the *Paul* case, including his prior history with the *Benson* case, his delays in the proceedings, and the "wasted judicial resources" expended in producing Judge Lamberth's Order and initiating the appeal. *See* HCR 35. Judge Lamberth's generous hope that Mr. Klayman would "understand" his obligations under Rule 1.9 hardly deserved the extra weight it got from the Board, in the context of disciplinary proceedings where Mr. Klayman has relentlessly pursued "the same meritless arguments" to justify what the Judge described as "a flagrant violation of a Rule of Professional Conduct essential to the proper functioning of our system of justice." DX 52 at 558.

**C. THE HEARING COMMITTEE'S FACT-FINDINGS ABOUT MR. KLAYMAN'S CREDIBILITY AND FALSE TESTIMONY WERE SUPPORTED BY SUBSTANTIAL RECORD EVIDENCE AND ENTITLED TO DEFERENCE.**

The Board report began simply by saying the Committee's fact-findings were supported by substantial evidence "with the exception of its finding that [Mr. Klayman] gave false testimony." Bd. Rpt. 2 (citing to its own discussion of sanction at p. 16). The Board made no further mention of either the finding or the testimony in question, in its section concerning the facts. Bd. Rpt. 3-5; *but see* HCR 12-13 (resolving historical facts and credibility relating to

14

testimony about advice of counsel in *Benson* and finding Mr. Klayman testified falsely). The Board thus only obliquely suggested the Hearing Committee lacked substantial evidence to support its finding that Mr. Klayman gave false testimony at the hearing. In fact, there was ample evidence to support the Committee's detailed factual findings about Mr. Klayman's dishonesty.

While discussing sanction, the Board referred only to the Committee's "Conclusions of Law," which addressed Mr. Klayman's contention in briefing, that he relied on advice of counsel when undertaking the *Benson* and *Paul* representations. Bd. Rpt. 16 (citing HCR 29-30; 41). The Committee there found Mr. Klayman "seriously mischaracterize[d] the evidence" by claiming he relied on Mr. Dugan's advice to enter his appearance in the *Benson* and *Paul* cases, claiming that Mr. Dugan "directed" Mr. Klayman to prepare the Opposition to disqualification, and that he "counseled [Mr. Klayman] that there was no conflict of interest . . . . [But t]he evidence clearly and convincingly establishes that he did not." HCR 29-30. The Committee went on:

> [Mr. Klayman] also falsely asserts that Dugan 'testified unequivocally that he would not have prepared and signed the Opposition [to the motion to disqualify in the Benson case] if he felt that ethics and the law did not support it.' Resp. [HC] Br. 11 (citing Klayman's own testimony). Actually Dugan testified unequivocally that he did not draft, construct the arguments, or research the opposition. Tr. 682, 684. When pressed by [Mr. Klayman] to say that it would have be[en] reasonable for [Mr. Klayman] to assume that Dugan agreed with the motion, Dugan simply answered 'No.' Tr. 691. Dugan testified only that he believed the opposition was not frivolous. Tr. 689

HCR 30. Curiously, the Board itself also found Mr. Klayman prevaricated in briefing to the Board, claiming he made a "mistaken and over-inclusive" admission in briefing to the Committee, whereas the Board found his "admission was not inadvertent; it appeared in a highly specific and detailed analysis of Disciplinary Counsel's filings by a *pro se* respondent."

Bd. Rpt. 9 n.5.

Nevertheless, continuing with its Sanction analysis, the Board announced that "[s]ince the Hearing Committee's findings of uncharged falsehoods were material to the sanction recommendation, we must review them *de novo*." Bd. Rpt. 16 (citing *In re Bradley*, 70 A.3d 1189 (D.C. 2013) (*per curiam*).[6]  The Board's "*de novo* review" consisted of revising the Committee's fact-findings and credibility assessments, and evaluating some aspects of Mr. Dugan's testimony but not in context and without Mr. Klayman's conflicting account. Bd. Rpt. 16-17. The Board decided Mr. Dugan's "diminished recollection and his prior, apparently inconsistent, statements convince[d]" the Board that Disciplinary Counsel had "failed to prove dishonesty by clear and convincing evidence." Bd. Rpt. 17 (citing *In re Downey*, 162, 168-69 (D.C. 2017)).[7]

The Board read *Bradley* too broadly and misapplied the Court's holding in any event. In *Bradley*, the Court held the question whether a lawyer "gave sanctionable false testimony before the Hearing Committee is a question of ultimate legal fact that the Board and this court review *de novo*." 70 A.3d at 1194. There, the lawyer claimed her memory failed her during testimony leading to her inconsistent statements. However, there was "*no factual support in the record* for

---

[6]     The Board mysteriously specified "uncharged" dishonesty, but dishonesty during hearing testimony and briefing in disciplinary cases -- such as the Committee found here -- occurs *while* litigating the "charged" violations and thus always will be "uncharged."

[7]     The question whether evidence of aggravating and/or mitigating circumstances, relied upon in the sanction phase of a bifurcated disciplinary hearing, must meet a "clear and convincing" or any particular standard of proof is currently pending before the Court, after being interjected by the Board in several disciplinary cases. *See, e.g. In re Schwartz*, Bar Docket No. 2009-D148 (BPR, July 31, 2017), *pending Court review*, DCCA No. 17-BG-1053; *In re Pearson* Bar Docket No. 2007-D149, BPR No. 15-BD-031 (Disciplinary Counsel's letter filed). Disciplinary Counsel does not concede that this standard would apply to Mr. Klayman's dishonesty for sanction purposes, but if it did, the Committee specifically found the "clear and convincing" standard was met as to Mr. Klayman's dishonest claims that he relied on advice of counsel. HCR 30.

the Committee's conclusion that [Bradley] simply misremembered" her detailed account of her claimed visits. *Id.* (emphasis added). Therefore, the Court concluded that the Board was correct in finding that she gave intentionally false testimony, aggravating the sanction.

In Mr. Klayman's case, by contrast, the Hearing Committee had substantial support in the evidence for its detailed fact-findings, specifically crediting Mr. Dugan and finding that Mr. Klayman testified falsely by saying he entered his appearance in the Benson matter on "advice of counsel" and that Mr. Dugan prepared the opposition to the disqualification motion. HCR 12-13. The Committee relied on multiple instances of Mr. Klayman's dishonest testimony about Mr. Dugan's role, as well as his misrepresentations in his briefing. HCR 29-31.

The Board, however, addressed only the credibility of Mr. Dugan's testimony, and not Mr. Klayman's contradictory testimony and briefs. Bd. Rpt. 16. The Board acknowledged Dugan testified that he "did not endorse [Mr. Klayman's] appearance" in Ms. Benson's case, but found "the forcefulness of that testimony was undercut by the witness's repeated, yet understandable, inability to recall the substance of key conversations in which he had participated with [Mr. Klayman] more than eight years earlier." Bd. Rpt. 16 (citing Mr. Klayman's brief and Tr. 677-79). Neither circumstance would detract from Mr. Dugan's emphatic testimony that he never advised Mr. Klayman that it was ethically appropriate to enter his appearance *before* Mr. Klayman did so. But the Board failed to evaluate Mr. Dugan's testimony in context in any event, to assess *what* he could not recall (having a discussion or giving advice) or to note that Mr. Dugan later clarified his answer:

> Q [by Disciplinary Counsel]. And just to be clear, did you advise him Mr. Klayman that it was appropriate to represent Louis Benson against Judicial Watch?
>
> MR. KLAYMAN: Asked and answered.

THE WITNESS:   I don't remember that question ever coming up in exactly that concept (sic).  Mr. Klayman said that he was going to enter his appearance and he intended to represent Louis Benson, and I didn't have any way to really stop him and nor did I ever give him any advice expressly that said no, you can't do this.

COMMITTEE CHAIR METZLER:        Okay I'm going to _____

THE WITNESS:   He [] was essentially running the litigation before and after he entered an appearance.

. . .

Q [by Disciplinary Counsel].  Now, were you Mr. Klayman's attorney with respect to his entry of appearance in the Benson case, as opposed to being co-counsel – it's possible you were both – but was he seeking your advice on whether to – on whether it was appropriate to enter his appearance or not?

MR. KLAYMAN: Objection, Your Honor.

THE WITNESS:   No, he was not ___

COMMTITEE CHAIR METZLER:        Wait. Basis for the objection?

MR. KLAYMAN: That's fine, Your Honor. I'll let the answer stand.

BY COMMITTEE CHAIR METZLER:

Q.  Okay. So, if you could – if you have the questions in mind, you can proceed.

A.  Yes, when – when I was not given – I was not asked for, nor did I give my advice, as to whether Mr. Klayman should enter his appearance on behalf of Louise Benson in Civil Action 520-07.

Tr. 684-686.

    As to a "contemporaneous court filing [that] quoted [Mr. Dugan] as stating that there 'was no ethical issue' arising from Mr. Klayman's representation of Benson," the Board cited DX 29 at 5, a pleading filed by Judicial Watch in the underlying litigation. Bd. Rpt. 17.  In that filing, counsel for defendants represented that a letter (not attached to the pleading or produced at

the disciplinary hearing) apparently authored by Mr. Dugan, included such a statement.  Even if

Mr. Dugan had drafted such a letter, or ratified arguments supporting Mr. Klayman's appearance

in the *Benson* litigation, neither the alleged pleading nor Mr. Dugan's co-signing Mr. Klayman's

opposition to the disqualification motion amounts to contrary record evidence sufficient to

overturn the Committee's finding that Mr. Klayman falsely testified when he claimed he relied

*on the advice of counsel* as his basis for entering his appearance in the *Benson* matter.

The Board did not address the Committee's additional finding that Mr. Klayman's brief

"seriously mischaracterize[d] the evidence" by claiming Dugan's testimony showed "he relied

on the advice of his counsel . . . in both the Benson and Paul (Count IV) matters."  The

Committee specifically found: "Mr. Klayman himself testified that he did not discuss that

appearance with Dugan because it was 'essentially the same thing' as the appearance for

Benson." Tr. 485. *See* HCR at 29-30.

Over the several days of hearing, the Committee observed Mr. Klayman's demeanor and

attitude, contributing to its assessment of his candor and honesty.  In that light, it reported other

instances where it did not credit his claims:

- His suggestion that he acted *only* as fundraiser in the Benson matter was not
  credible. *Id.* at 25.

- His testimony and argument that his fundraising solicitation in the Benson matter
  had "nothing to do with his role as General Counsel of Judicial Watch" was
  "preposterous." *Id.* at n. 5

- His other attempts to minimize his involvement in the (Cobas matter) were not
  plausible. *Id* at 26.

Taken together, the Committee relied on multiple instances of Mr. Klayman's consistent lack

of candor.

**D.** **THE BOARD'S RECOMMENDED SANCTION, OMITTING A FITNESS REQUIREMENT BEFORE REINSTATEMENT, IS UNWARRANTED, BECAUSE THE BOARD ERRED IN REJECTING THE HEARING COMMITTEE'S FACT-FINDINGS AND ITS SERIOUS DOUBT AS TO MR. KLAYMAN'S LIKELIHOOD OF FUTURE COMPLIANCE WITH HIS ETHICAL OBLIGATIONS.**

The Hearing Committee found Mr. Klayman's misconduct fell on the serious end of the spectrum and it did not believe ordinary remedial measures would "be sufficient to protect the public against [Mr. Klayman's] repeated and prolonged abuse of the judicial system." HCR 40-41. Because it found "clear and convincing evidence of a serious doubt about his ability to practice in conformance with the rules," it recommended the Court sanction Mr. Klayman by suspending him from practice for 90 days, and conditioning his reinstatement on a showing of fitness to practice. HCR 41.

The Board revised that recommendation to a 90-day suspension without requiring a showing of fitness. B. Rpt. 20. It found Mr. Klayman's misconduct was serious, comparing it with the misconduct in *In re Shay*, 756 A.2d 465 (D.C. 2000) and *In re Jones-Terrell*, 712 A2d 496 (D.C. 1998). Bd Rpt. 19. It pointed out his misconduct "was not isolated or inadvertent. Rather, he deliberately and repeatedly disregarded his fundamental duty of confidentiality . . . he flagrantly violated Rule 1.9 on three separate occasions, and throughout this proceeding has refused to acknowledge those improprieties." Bd. Rpt. 18. He "showed no remorse" and "switched sides" in order to "advance his personal crusade against Judicial Watch . . . This vindictiveness strikes at the very heart of the attorney-client relationship . . ." Bd. Rpt. 19-20. The Board also described itself as "troubled" by Mr. Klayman's lack of remorse, but it overrode the Committee's recommendation of a fitness requirement. Bd. Rpt. 20. According to the Board, the Committee "relied heavily on its finding that [Mr. Klayman] testified dishonestly and

its consideration of prior discipline in Florida," but the Board did not find "clear and convincing evidence that [Mr. Klayman] testified falsely, and [saw] the Florida discipline as less serious . . ." *Id.* For that reason it did not find clear and convincing evidence of a serious doubt about fitness. *Id.* (citing *In re Cater*, 887 A.2d 1 (D.C. 2005).

The Board's recommendation is unwarranted, in light of the Committee's well-supported factual findings and credibility determinations. This Court has held that fitness should be imposed where the record "contain[s] clear and convincing evidence, that casts a serious doubt upon the attorney's continuing fitness to practice law." *In re Cater*, 887 A.2d at 22-223.

Moreover, "even where the misconduct" is not grave enough to evoke such a doubt", other "aggravating facts may justify enhancing the sanction of suspension with a fitness requirement." *Id.* at 25. In determining whether fitness should be imposed, the Court considers factors such as (1) the nature and circumstances of the misconduct for which the attorney was disciplined; (2) whether the attorney recognizes the seriousness of the misconduct; (3) the attorney's conduct since discipline was imposed, including the steps to remedy past wrongs and prevent future ones; (4) the attorney's present character; and (5) the attorney's present qualification and competence to practice law. *Id.* at 20; *In re Chisholm*, 679 A.2d 495, 503 (D.C. 1996); *In re Steele*, 630 A.2d 196, 201 (D.C. 1993).

In this matter, the Committee concluded that:

> . . . . [Mr. Klayman's] conduct in the proceeding was dishonest and lacked candor in further aggravation of his misconduct . . . [Mr. Klayman] testified falsely that he acted under the advice of counsel [Mr. Dugan] when he entered his appearance for Benson. [Count II] He did not. Mr. Klayman's post-hearing brief repeatedly mischaracterizes Mr. Dugan's testimony, particularly with regard to whether Dugan prepared the oppositions to the motion to disqualify [Mr. Klayman] in the Benson case, agreed with the arguments it contains, and advised [Mr. Klayman] regarding his representation of Paul [Count III]. We also find [Mr. Klayman's] characterizations of the evidence lack the candor required of an attorney in a

disciplinary proceeding.

HCR at 37. The Committee also found that Mr. Klayman's misconduct in the underlying prosecution was aggravated by his prior discipline in Florida. Bd. Rpt. 17. The Board characterized the Florida discipline as nothing more than an agreement to a reprimand, and gave little weight to Mr. Klayman's delayed compliance with the terms. *Id.* 18. The Committee found that Mr. Klayman's misconduct was aggravated by his Florida discipline because he *currently* failed to take responsibility for his unethical actions:

> Remarkably, [Mr. Klayman] suggests that he agreed to the reprimand "to simply put the matter behind [him]," *and claims that his conduct did not involve "any ethical violations."* Resp. Br. 37 at 4. That is simply not true.

HCR 37. (emphasis added). Once again, the Committee identified the record evidence showing he prevaricated. The Florida discipline clearly involved a violation of its ethical rules. Mr. Klayman's denial before the Committee that he engaged in ethical misconduct informed the Committee's decision to view it as an aggravating factor in these proceedings.

The Committee thus relied on many more facets than suggested in the Board's limited discussion. Indeed, the Committee pointed to Mr. Klayman's continued lack of candor about the Florida discipline as more important than the discipline itself, a point the Board never mentioned. The Committee observed that Mr. Klayman's misconduct was motivated by a "prolonged and acrimonious" dispute with his former client, Judicial Watch, and that "it is hard to see Mr. Klayman's actions as anything other than an improper attempt to prolong litigation, increase costs for Judicial Watch, and further his personal crusade against the organization." *Id.*

In recommending fitness consistently with the standards considered for such a sanction, the Committee reported:

> As described above, [Mr. Klayman's] misconduct was serious and escalating. He does not recognize the seriousness of the misconduct at all.

> His conduct since the three representations includes both the Florida misconduct and his misrepresentations and lack of condor to this tribunal. In the view of this hearing committee, [Mr. Klayman's] conduct raises serious concerns about whether he will act ethically after this period of suspension has run and supports imposing a condition that he demonstrate his fitness before assuming the practice of law. (Citation omitted)

*Id.* at 42. An attorney's false testimony before a hearing committee "is a significant aggravating factor" that warrants an enhanced sanction. *In re Cleaver-Bascombe*, 892 A.2d 396, 4112-13, (D.C. 2006). Mr. Klayman falsely testified about material issues in both the violations phase and the mitigation/aggravation phase of the proceedings.

Given the Committee's doubts about Mr. Klayman's honesty, the seriousness of his misconduct and his lack of ethical awareness, conditioning his reinstatement upon a showing that these ethical challenges are no longer a part of his character, is essential to protect the public going forward.

## CONCLUSION

For the foregoing reasons, Disciplinary Counsel respectfully requests that the Court issue an order suspending Mr. Klayman from the practice of law for ninety days with his reinstatement conditioned upon a showing that he is fit to resume the practice of law.

Respectfully submitted,

Elizabeth A. Herman
Deputy Disciplinary Counsel
Bar Registration No. 940254

Jennifer P. Lyman
Senior Assistant Disciplinary Counsel
Bar Registration No. 272138

H. Clay Smith, III
Assistant Disciplinary Counsel
Bar Registration No. 84876

OFFICE OF DISCIPLINARY COUNSEL
515 5th Street, N.W.
Building A, Room 117
Washington, D.C. 20001
(202) 638-1501

## CERTIFICATE OF SERVICE

I hereby certify that I caused copies of the foregoing Brief of Disciplinary Counsel to be served by first-class mail, postage-prepaid, Larry E. Klayman, Esquire, c/o Stephen A. Bogorad and John Thorpe Richards, Jr. at Bogorad & Richards PLLC, 209 Madison Street, Suite 501, Alexandria, VA 22314, and electronically delivered to James T. Phalen, Esquire, Executive Attorney, Board on Professional Responsibility, Historic Courthouse, 430 E Street, N.W., Suite 138, Washington, D.C. 20001, this 11th day of June 2018.

H. Clay Smith, III
Assistant Disciplinary Counsel

EXHIBIT "2"

# IN THE UNITED STATS DISTRICT COURT
## DISTRICT OF COLUMBIA

LARRY KLAYMAN, an individual
7050 W. Palmetto Park Road, #15-287
Boca Raton, FL, 33433

               Plaintiff,

v.

HAMILTON FOX, in his individual capacity
c/o 515 Fifth Street NW
Building A, Suite 117
Washington, DC 20001

    And

ELIZABETH HERMAN, in her individual
capacity
c/o 515 Fifth Street NW
Building A, Suite 117
Washington, DC 20001

    And

H. CLAY SMITH, III, in his individual
capacity
c/o 515 Fifth Street NW
Building A, Suite 117
Washington, DC 20001

    And

JULIA PORTER, in her individual capacity
c/o 515 Fifth Street NW
Building A, Suite 117
Washington, DC 20001

    And

OFFICE OF DISCIPLINARY COUNSEL
515 Fifth Street NW
Building A, Suite 117
Washington, DC, 20001

         Defendants.

Case No.:


**COMPLAINT**

## I.    INTRODUCTION

1.    Plaintiff Larry Klayman ("Mr. Klayman") brings this action against individual Defendants Hamilton Fox ("Defendant Fox"), Elizabeth Herman ("Defendant Herman"), H. Clay Smith III ("Defendant Smith"), and Julia Porter ("Defendant Porter") (collectively "Defendants"). The Individual Defendants are all employed by the District of Columbia Office of Disciplinary Counsel ("ODC") which "serves as the chief prosecutor for attorney disciplinary matters involving active or inactive attorneys who are members of the D.C. Bar."[1] Defendant Fox, Defendant Herman, Defendant Smith, and Defendant Porter, while acting in concert in a conspiracy under the "color" of state law, are being sued for actions taken in their individual capacities and outside the scope of their official duties. ODC is being sued in its official capacity. Defendants, acting in concert and as joint tortfeasors, intentionally violated Mr. Klayman's statutory, constitutional and other rights due to Mr. Klayman's political beliefs, public interest activism, and gender, pursuant to their own individual biases, prejudices, political views, loyalties, and allegiances.

## II.    JURISDICTION AND VENUE

2.    This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 (Federal Question Jurisdiction).

3.    This Court has diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332, as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

4.    This Court has supplemental jurisdiction over this case pursuant to 28 U.S.C. § 1367.

---

[1] https://www.dcbar.org/attorney-discipline/office-of-disciplinary-counsel/obcmission.cfm

5. Venue is proper pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391(b)(2), (3) in that Defendants reside here and are subject to personal jurisdiction in this District. Venue is proper in the District of Columbia because the Individual Defendants are all employed by the District of Columbia Office of Disciplinary Counsel, and the conduct complained herein arises out of Defendants' unconstitutional and illegal conduct as ODC attorneys.

## III. PARTIES

6. Plaintiff Larry Klayman is an individual, a natural person. Mr. Klayman is at all relevant times a citizen and resident of the state of Florida.

7. Defendant Hamilton Fox is an individual, a natural person. Defendant Fox is at all relevant times a citizen and resident of the District of Columbia.

8. Defendant Elizabeth Herman is an individual, a natural person. Defendant Herman is at all relevant times a citizen and resident of the District of Columbia.

9. Defendant H. Clay Smith III is an individual, a natural person. Defendant Smith is at all relevant times a citizen and resident of the District of Columbia.

10. Defendant Julia Porter is an individual, a natural person. Defendant Porter is at all relevant times a citizen and resident of the District of Columbia.

11. Defendant Office of Disciplinary Counsel serves as the chief prosecutor for attorney disciplinary matters, and purports to have a dual function: "to protect the public and the courts from unethical conduct by members of the D.C. Bar and to protect members of the D.C. Bar from unfounded complaints."

///

///

///

3

## IV.    STANDING

12.     Mr. Klayman has standing to bring this action because he has been directly affected by the unlawful conduct complained herein.  His injuries are proximately related to the conduct of Defendants.

## V.    FACTS

### *Facts Pertaining to Mr. Klayman's Representation of Ms. Sataki*

13.     Mr. Klayman is an attorney licensed to practice law in the District of Columbia, who has been a member continuously in good standing since 1980 and with no current disciplinary record.

14.     On November 2, 2010, about eight years ago, a Complaint was filed against Mr. Klayman with the ODC, styled *In re: Klayman*, Bar Docket No. 2011-D028. (the "Sataki Complaint").

15.     The Sataki Complaint was implemented as the result of two separate complaints, both prepared and filed by non-lawyers on behalf Elham Sataki ("Ms. Sataki"), engaging in the unauthorized practice of law then and at all material times thereafter.

16.     Ms. Sataki has refused to identify who filed the first complaint on her behalf. The second complaint was prepared and filed by either Kathleen Staunton or Sam Razzazi, her cousin, who uses many aliases and is a convicted felon.

17.     The Sataki Complaint was based on Mr. Klayman's representation of Ms. Sataki's interests in a sexual harassment action against her former employer, Voice of America ("VOA Lawsuit") in case styled *Sataki v. Broadcasting Board of Governors, et al*, 1:10-cv-00534 (D.D.C).

18.     The scope of Mr. Klayman's services, performed along with Ms. Sataki's union representative and president, Mr. Tim Shamble ("Mr. Shamble") included, *inter alia*, the filing of

4

an administrative EEO/VOA Office of Civil Rights ("OCR") complaint, lobbying congressmen and senators to intervene on Ms. Sataki's behalf, engaging in approved publicity by Ms. Sataki to try to coax a settlement, and filing the VOA Lawsuit in the U.S. District Court for the District of Columbia ("District Court") to preserve the "status-quo" while the EEO/OCR complaint proceeded administratively.

19.     The VOA Lawsuit, which was also filed with Ms. Sataki's knowledge and consent, and which sought to ask the District Court to put Ms. Sataki to work at another VOA office in Los Angeles - away from her alleged harasser – was eventually improperly dismissed by the District Court, without even providing an evidentiary hearing.

20.     Furthermore, the EEO/OCR administrative complaint was ultimately not successful.

21.     Prior to and during the course of Mr. Klayman's representation of Ms. Sataki, he developed a close friendship with her, within the bounds of the relevant rules of professional responsibility and ethics.

22.     At the time, Mr. Klayman sympathized with Ms. Sataki's apparent plight, as she had claimed to be destitute and stuck in an untenable work situation. Mr. Klayman was himself going through a difficult time in his life, and therefore identified with Ms. Sataki's alleged problems. This motivated Mr. Klayman to work extremely diligently on Ms. Sataki's behalf, pro bono.

23.     As a close friendship developed further during the course of the legal representation, Mr. Klayman took it upon himself to help Ms. Sataki on a personal level, including moving her out to Los Angeles to escape her alleged harasser, paying for her apartment, and other expenses, at a personal cost of about $ 30,000, and even finding

psychologists for her and paying for some of her psychological counseling, for which she was otherwise insured.

24.     Ms. Sataki, however, began to exploit and take advantage of her close friendship with Mr. Klayman, at one point asking Mr. Klayman to purchase a car for her. Mr. Klayman declined to do so.

25.     Specifically, as a "final straw," Ms. Sataki's request that Mr. Klayman purchase a car for her and her other actions led Mr. Klayman to realize that he could not continue legal representation of Ms. Sataki. Mr. Klayman thus suggested that it would be best if Ms. Sataki found new counsel to represent her in her claims against VOA.

26.     Mr. Klayman even referred Ms. Sataki to his personal friend, Gloria Allred, Esq., a famous women's rights legal advocate, as well as Tim Shea, Esq., who had come suggested by Mr. Shamble.

27.     When Ms. Sataki's complaints against VOA did not yield immediate results, Ms. Sataki became more difficult, demanding, belligerent, frequently disrespectful, and hard to reach.

28.     Due to this, Mr. Klayman suggested that they memorialize their attorney-client relationship with a contingent fee agreement.

29.     This never occurred because a series of events ultimately resulted in Mr. Klayman no longer representing Ms. Sataki.

30.     Mr. Klayman and Mr. Shamble were unable to reach Ms. Sataki after this point, and in an abundance of caution, Mr. Klayman filed at his further expense on Ms. Sataki's behalf, an appeal to the U.S. Court of Appeals to the District of Columbia Circuit, regarding the District Court's dismissal of the VOA Lawsuit in order to ensure that Ms. Sataki's right of appeal was protected and not lost.

31.     At the end of the day, Ms. Sataki was not able to obtain relief through either the EEO/OCR process or the District Court, but not due to lack of effort from Mr. Klayman, who worked extremely diligently on her behalf, even on a pro bono basis.

### Facts Pertaining to Ms. Sataki's Complaint Against Mr. Klayman

32.     On November 2, 2010, nearly eight years ago, persons who are not lawyers anonymously filed ODC complaints against Mr. Klayman purportedly on Ms. Sataki's behalf – as set forth previously - regarding the VOA lawsuit ("Sataki Complaint") pertaining to his other pro bono representation.

33.     These non-lawyers also filed corresponding identical complaints with The Florida Bar and the Pennsylvania Bar, both of which were summarily dismissed because they were not based upon fact or law, much less the clear and convincing evidence required to substantiate these types of claims.

34.     Nevertheless, ODC sent Ms. Sataki a letter dated July 7, 2011 containing Mr. Klayman's response, with explicit instructions that "[i]f we do not hear from you promptly, we may assume that you are satisfied with the attorney's explanations."

35.     Afterwards, Ms. Sataki abandoned the Sataki Complaint, as evidenced by ODC's own internal correspondence and admissions. However, Defendants, for their own unethical, unconstitutional, illegal, and tactical reasons, outrageously and incredibly resurrected Ms. Sataki's complaint six years later, as set forth in detail in the following paragraphs. During this time period, believing that the Complaints before ODC had also been dismissed, as they had been in Florida and Pennsylvania, Mr. Klayman understandably did not retain the files necessary to defend himself. In addition, during this interim time period, relevant documents were lost, witnesses moved, and memories faded.

36.     On January 15, 2014, ODC Counsel H. Clay Smith III ("Defendant Smith") sent an email to ODC investigators Chuck Anderson and Kevin O'Connell, stating, "I am trying to locate a complainant [Ms. Sataki] that has dropped off the map...She filed a complaint vs. Larry Klayman in 2011. Her only correspondence with us was the ethical complaint that she filed."

37.     ODC then, about seven years after the complaints were purportedly filed by Ms. Sataki, filed a Specification of Charges with the District of Columbia Board of Professional Responsibility without providing Mr. Klayman proper notice, or granting a meeting as requested with the new Disciplinary Bar Counsel Hamilton Fox ("Defendant Fox"), in contravention of ODC's policy and practice and Mr. Klayman's due process and other constitutional and statutory, and legal common law rights, which had already been compromised during the previous seven years of unconscionable and highly prejudicial delay.

38.     A draft of the Specification of Charges were prepared even before Mr. Klayman was given an opportunity to file a supplemental response, which evidences ODC's punitive and biased mindset and improper, unethical, unconstitutional and illegal motivations, all in violation of accepts norms concerning statutes of limitations, laches, and other laws.

### *Facts Pertaining to ODC Misconduct*

39.     The Individual Defendants, acting in concert as joint tortfeasors, each and every one of them, have engaged in a pattern and practice of abusing and exceeding their position of authority, which is granted under state law, but which the abuse of authority is not, to act outside the scope of their official duties and intentionally violate Mr. Klayman's constitutional and other rights by selectively prosecuting Mr. Klayman because of his political activism, free speech, and gender, as set forth in more detail below.

40.     ODC has also engaged in a pattern and practice of abusing and exceeding its position of authority, which is granted under state law, but which the abuse of authority is not, to act outside the scope of their official duties and intentionally violate Mr. Klayman's constitutional and other rights by selectively prosecuting Mr. Klayman because of his political activism, free speech, and gender.

41.     Mr. Klayman is a prominent conservative and non-partisan attorney and public interest activist who has brought lawsuits against Hillary Clinton, Barack Obama, George W. Bush, and other politicians and government officials. He conceived of and founded the prominent public interest watchdogs, Judicial Watch, Inc. and Freedom Watch, Inc., and is a former U.S. Department of Justice federal prosecutor, having been on the trial team which broke up the AT&T monopoly during the Reagan administration. In 2003-2004, he ran for the U.S. Senate in the Florida Republican Primary. Mr. Klayman is also the only lawyer to ever have a court rule that former President Bill Clinton had committed a crime, when he illegally released the Privacy Act protected White House government file of a woman he had allegedly sexually abused and harassed in the Oval Office. Her name is Kathleen Willey. Mr. Klayman has also represented Juanita Broaddrick, Gennifer Flowers, Paula Jones, Dolly Kyle Browning, and other Bill Clinton female victims, who Hillary Clinton is alleged to have retaliated against and tried to destroy to advance her and her husband's political interests. Mr. Klayman is a supporter of and legal advocate for women's rights.

42.     Even a quick search of FEC records shows that Defendant Fox, as well as Deputy Bar Disciplinary Counsel Elizabeth Herman ("Defendant Herman") both donated significant sums of monies to Hillary Clinton and Barack Obama as well as other liberal Democrats.

43.    It is clear that Defendants' goal is to prevent Mr. Klayman from being able to practice law because they do not agree with his political and other beliefs, and in retaliation for his gender during this highly charged period when men are frequently presumed guilty of even provably false allegations.

44.    Because of his conservative beliefs, Defendants Herman and Porter, who are both Deputy Bar Disciplinary Counsel, in particular, apparently see Mr. Klayman as anti-women, all of which is not true. It was apparent to Mr. Klayman Defendants Herman and Porter in particular wanted to take disciplinary action against Mr. Klayman due to his gender and activism, and thus enlisted the other Defendants, including the new Bar Disciplinary Counsel, Defendant Fox, to follow suit and work in concert with them.

45.    After many years, Defendants have improperly, unethically, illegally, and suddenly revived the Sataki Complaint for purely tactical and strategic reasons, despite the fact that the original complainant, Ms. Sataki, had abandoned it.

46.    Indeed, the tactical purpose for the sudden, unexplained, and unwarranted revival of the Sataki Complaint, after 8 years of delay and after two other state bars summarily and timely dismissing identical complaints – Pennsylvania and Florida –– hinges on a hearing committee's remedial recommendation with regard to another pending ethics complaint against Mr. Klayman, Bar Docket No. 2008 D048 ("the Judicial Watch Complaint") that Mr. Klayman must, after serving his proposed three-month suspension, then petition for reinstatement based on the fitness to practice law.

47.    Thus, if Defendants can "pile on" by filing a new case or cases before the Board, as they have done with regard to the Sataki Complaint, they can argue that this on-going proceeding, which would go on for years, would be grounds for Mr. Klayman not to be

reinstated, effectively disbarring him, especially since he is now almost 67 years old – in effecting involuntarily retiring of Mr. Klayman. This piling on is also intended to bankrupt Mr. Klayman, as he has already expended considerable monies in defense of the Judicial Watch matter. Thus, regardless of Defendants' chances of success in the Sataki case, Defendants can seek to silence Mr. Klayman just by driving him into financial ruin. Other recent threats of an additional bar proceeding, forwarded by Defendant Porter on her own behalf and on behalf of the other Defendants, acting in concert, which would serve to have Mr. Klayman spend considerable monies he cannot afford, have also been levied by Defendants

48.    The dishonesty of the Individual Defendants and the fact that the sudden revival of the Sataki Complaint is nothing more than an unethical, unprofessional, unconstitutional and illegal tactical strategy is strongly evidenced by ODC's filing of a frivolous assignment of error to the Board's decision to remove the reinstatement provision in the Judicial Watch Complaint.

49.    Indeed, the reason that the Board reversed its decision and removed the reinstatement provision in the Judicial Watch matter is that it it found that Mr. Klayman had been honest in stating that he had received what in effect was advice of counsel for the acts that he had been charged with. ODC never argued for or challenged this finding at the time, yet still dishonestly, opportunistically and unethically filed an assignment of error after the fact.

50.    Defendant Smith told Mr. Klayman that he was relieved that the reinstatement provision was removed, as he "didn't think it was right." However, he said the filing of the assignment of error was "out of his hands" and belonged to the other Defendants.

51.    The Individual Defendants have not hidden, or even attempted to hide their deep-seated resentment and bias and animus towards Mr. Klayman due to his political beliefs, activism, free speech, and gender

52.     Confirming and thus supporting the fact that Mr. Klayman is being selectively, unethically, unconstitutionally, and illegally prosecuted for his politics, activism, free speech, and gender, is the extremely hostile and disrespectful demeanor and words Defendant Herman exhibited during a meeting that occurred on July 28, 2017 and at other times, which exhibited bias and discrimination as well, based on his public advocacy, free speech, and gender.

53.     Defendant Herman abruptly and in a hostile voice refused to say whether she had had contact and/or met with Ms. Sataki. In fact, she told Mr. Klayman that this was "none of his [male] business."

54.     Furthermore, Defendant Herman's brazenly and openly admitted her bias and animus against Mr. Klayman due to his political beliefs, activism, free speech, and gender, which explains her participation in her baseless prosecution against him, when she curtly and in a hostile manner, on more than one occasion, stated to Mr. Klayman, "I [we] don't like the way you practice law."

55.     It is indisputable that Defendant Herman's personal feelings should have no impact on the performance of her professional duties, but her open admission clearly shows that she is driven by her bias and animus due to Mr. Klayman's political beliefs, activism, free speech, and gender.

56.     Furthermore, when Mr. Klayman advised Defendant Herman at the same meeting that The Florida Bar and the Pennsylvania Bar had summarily dismissed Ms. Sataki's claims, she on behalf of Defendants stated that "we could care less."

57.     This gender-based and political vendetta against Mr. Klayman is clearly demonstrated and confirmed in a meeting that that Mr. Klayman had with Defendant Smith on September 29, 2017.

58.     The purpose of this meeting was to discuss another vindictive Complaint filed by Mr. Fitton, president of Judicial Watch, as well as the pending Sataki matter.[2] Defendant Smith strangely suggested that rather than appeal the hearing committee's findings with regard to the first Fitton/Judicial Watch Complaint alleging conflicts of interest to the Board, that he simply agree to resign from the bar, which is in effect, disbarment.

59.     Mr. Fitton's retaliatory vindictiveness stems from Mr. Klayman having previously obtained a jury verdict against Judicial Watch for malicious defamation, which Mr. Fitton as President of Judicial Watch caused and furthered, and which award included punitive damages.[3]

60.     Defendant Smith then stated that if Mr. Klayman would agree to this, it could be done quietly and that no one else would know, preventing embarrassment to and bad publicity for Mr. Klayman, suggesting that the Defendants would otherwise seek to smear and thus harm Mr. Klayman publically by destroying his professional and personal reputation. This obviously is not only a false premise, and contrary to the remedies that had been previously recommended to the hearing committee by ODC, which fell well short of what was in effect, disbarment.

61.     However, apparently seeing that the hearing committee was recommending three months' suspension with a requirement of petitioning for reinstatement based on a showing of the fitness to practice law, Defendants – acting in concert through Defendant Smith -  now outrageously, without factual or legal basis, suggested that resignation would be the easier and less humiliating road for Mr. Klayman to agree to.

62.     Mr. Klayman was confused at the time as to why Defendant Smith would made

---

[2] Indeed, it is no coincidence that an attorney of Judicial Watch, James Peterson, has been present at the Sataki hearing, which commenced on May 30, 2018, and has been taking notes to further Mr. Fitton's damaging smear campaign against Mr. Klayman. Mr. Fitton and Judicial Watch were obviously tipped off by Defendants, acting in concert with Mr. Fitton, to damage Mr. Klayman further through false publicity and other unethical, illegal, and improper means.

[3] *Klayman v. Judicial Watch*, 13-cv-20610 (S.D. Fla.).

such a strange and outrageous suggestion, but in retrospect Mr. Klayman has reason to believe, based on the facts pled herein, that it was a warning to Mr. Klayman that there was a concerted effort by his superiors at ODC, including but not limited to Defendants Fox, Herman, and Porter, to remove him from the practice of law and that this was beyond his control, which has now been clearly demonstrated in the Individual Defendants' actions, acting in concert.

63.     Mr. Klayman asserts that even though Defendant Smith is simply and pliantly following the orders of his superiors, Defendants Fox, Herman, and Porter, he is still equally liable and thus culpable, as all of the Defendants are acting in concert.

64.     In that regard, ODC recently even transferred the most recent Fitton Complaint from Defendant Smith to Defendant Porter, obviously because ODC did not want anyone who may be sympathetic to Mr. Klayman to handle the matter. She then, confirming her complicity, threatened Mr. Klayman with another bar proceeding, claiming to have even prepared a draft specification of charges before Mr. Klayman could even respond to this threat.

65.     Even more, as set forth above, Defendants would not allow Mr. Klayman the courtesy of a meeting with Defendant Fox before rushing to file a Specification of Charges with the Board in the Sataki matter.

66.     This refusal to allow a meeting is also due to the conflict of interest that Defendant Fox claimed to have suffered, for which Defendant Fox was trying to hide.

67.     Indeed, while it was clear that Defendant Fox had been involved in the so-called investigation and prosecution of Mr. Klayman from the very outset, he disingenuously and defensively demanded that Mr. Klayman sign a conflict of interest waiver before finally agreeing to a meeting with him and Mr. Klayman after the Specification of Charges had already been filed before the Board.

68.     The conflict of interest – which Defendant Fox clearly recognized and admitted –
stems from the fact that Defendant Fox, while previously a lawyer and partner at Sutherland,
Asbill and Brennan, represented Mr. Klayman's interests when he defended a deposition of his
then partner, Herbert Beller, concerning a severance agreement he negotiated for Mr. Klayman,
noticed by Judicial Watch, the public interest group which Mr. Klayman founded in 1994, and
which through its president Tom Fitton had, as retaliation, vindictively complained against Mr.
Klayman in the pending matter now before the District of Columbia Court of Appeals.

69.     During a May 11, 2018 meeting to discuss the Sataki Specification of Charges,
and the gross prosecutorial misconduct of the Defendants up to that point, for which Mr.
Klayman had substantial hard evidence, Defendant Fox acted extremely hostile towards Mr.
Klayman, further confirming the bias and animus against Mr. Klayman due to his political
beliefs, activism, speech, and gender.

70.     Mr. Klayman was surprised to find that both Defendant Deputy Bar Counsel Julia
Porter ("Defendant Porter") and ODC's described investigator, Kevin O'Connor would be
present in the meeting, which had not been disclosed previously.

71.     From the outset, Defendant Fox immediately and belligerently stated that he was
not going to hear anything about or discuss dismissal of the Specification of Charges, but that
Mr. Klayman could simply produce the evidence of misconduct and unethical and illegal
behavior.

72.     Mr. Klayman calmly responded that he would not be dictated to as to what he
could discuss. This prompted Defendant Fox to stand up threateningly and scream "this meeting
is over" and that Mr. Klayman "should leave [his] office."

73.     When Mr. Klayman got up from his chair, he indicated that this gross prosecutorial misconduct would leave him no recourse but to file this instant Complaint, as well as bar grievances which are attached hereto as *Exhibit 1* and are incorporated herein by reference.

74.     Defendant Fox then approached Mr. Klayman at the door, as if to stalk him and screamed, "I welcome your complaint," adding in a hostile voice, "do you seriously believe that I would not welcome the opportunity through discovery to show how you practice law."

75.     This more than confirms Defendants' improper motivations, that the mission of Defendants is to unlawfully attempt to remove Mr. Klayman from the practice of law, by whatever unprofessional, unethical, unconstitutional, and illegal means are used to "justify" these ends.

76.     Indeed, it is clear that Mr. Klayman is being selectively prosecuted by Defendants based on politics, activism, free speech, and gender.

77.     It was even revealed that Defendants purposefully and intentionally withheld exculpatory documents and evidence when they had a duty to turn them over to Mr. Klayman.

78.     As another example, ODC quickly, improperly, and unethically disposed of a valid and meritorious Complaint filed by Mr. Klayman against Paul Orfanedes ("Mr. Orfanedes"), Judicial Watch's litigation director, centered around Mr. Orfanedes' participation in a misappropriation of 1.4 million dollars of donor money.

79.     In fact, Defendant Herman admitted that this Complaint was summarily dismissed, less than a month after it was received, and it was never even processed or opened for a full investigation, despite the uncontroverted fact that Mr. Orfanedes, a member of the bar, had participated in the outright theft of 1.4 million dollars of donor money over 15 years.

80.     On the other hand, the clearly non-meritorious Sataki Complaint, which not based in law or fact (which has been demonstrated to Defendants through sworn affidavits and the summary dismissal of the Florida and Pennsylvania ones), has been pending against Mr. Klayman for now about eight years, a condition that would not be permitted in other jurisdictions and should not be countenanced in this one, due to ordinary norms of laches, statute of limitations, fundamental fairness, much more due process and equal protection under the Constitution.

81.     This striking dichotomy is clear evidence of unconstitutional and illegal selective prosecution, bias, and personal animus that must be remedied.

82.     As a result of Defendants' prosecutorial misconduct, Mr. Klayman has been damaged by his having to expend significant time and resources defending himself against this baseless prosecution, including but not limited to attorney's fees, costs, travel and other expenses, as well as personal and professional time lost preparing for his own defense. It has also damaged Mr. Klayman by intentionally causing him severe emotional distress. Defendants' prosecutorial misconduct has been carefully and cynically calculated to bankrupt Mr. Klayman, so that he is no longer able to practice law or engage in his public interest advocacy, which Defendants do not agree with and despise. Defendants intent is to smear Mr. Klayman and fatally damage his personal and professional reputations, affecting his family and livelihood, which damage has already occurred and is continuing.

83.     *See, e.g., Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (a constitutional violation and loss of constitutional protections "'for even minimal periods of time, unquestionably constitutes irreparable injury'") (quoting *Elrod v. Burns,* 427 U.S. 347, 373

(1976)). Irreparable injury is present with regard to Defendants' unconstitutional conduct toward Mr. Klayman, which has severely damages him and is continuing to severely damage him

84.     Indeed, it is no coincidence that an attorney of Judicial Watch, James Peterson, has been present at the Sataki hearing, which commenced on May 30, 2018 and ended on June 27, 2018, and later another Judicial Watch attorney, Michael Bekesha, had been taking notes to further Mr. Fitton's damaging smear campaign against Mr. Klayman. Mr. Fitton and Judicial Watch were obviously tipped off by Defendants, acting in concert with Mr. Fitton, to damage Mr. Klayman further through false publicity and other improper means.

85.     Mr. Klayman thus filed ethical complaints with ODC setting forth the gross misconduct by the Defendants specified above, which facts are incorporated herein by reference. *Exhibit 1.*

86.     On June 5, 2018 and thereafter, the chair of the Board of Professional Responsibility, Robert C. Bernius, incredibly informed Mr. Klayman that the Board will not pursue any remedial action, much less open an internal investigation of the alleged prosecutorial misconduct and violation of ethics, the law, and the Constitution. Mr. Klayman has also asked the District of Columbia Bar's general counsel, president, and chief executive officer, Marlon Paz, Esther Lim, and Robert Spanoletti, respectively, to review the unethical, unconstitutional, and illegal conduct set forth in *Exhibit 1*, and they have failed to take action in furtherance of this apparent "cover up" to protect their own, with a "circle the wagons" mentality, motivation, and practice. *Exhibit 2.*

87.     Defendants and the Board of Professional Responsibility are not, and cannot be, above ethics, the law, much more the Constitution. Mr. Klayman therefore has no recourse but to file this instant Complaint, as he has no legal or other remedies remaining.

88.     As further evidence of ODC and the District of Columbia Bar's political biases and motivations to chill free speech and other constitutional rights by conservatives, and those they wrongfully perceive to be anti-feminist and anti-women as a result, ODC and the other Defendants are entertaining, if not soliciting, completely meritless complaints against conservative activists and figures.

89.     Attached hereto as *Exhibit 3*, is a Complaint filed by a group of law professors against Counselor to the President of the United States, Kellyanne Conway ("Conway Complaint"), also a member of the bar, seeking to discipline her for her political activities and beliefs, as well as to have a chilling effect on her free speech on behalf of President Donald J. Trump.

90.     Even a law professor from Northwestern University, Steven Lubet, a self described "liberal Democrat," wrote for Slate Magazine, a far left publication, that the Conway Complaint "is dangerously misguided and has the potential to set a terrible precedent.[4]"

91.     One of the signatories to the Conway Complaint, has somehow, perhaps not coincidentally in all likelihood, been placed on the hearing committee that is adjudicating the Sataki Complaint, which at least creates a strong appearance of clearly demonstrating the unconstitutional political biases, gender based discrimination, and intent to silence conservative figures and activists like Mr. Klayman and Ms. Conway.

92.     Indeed, Mr. Klayman himself has been a vocal, strong, and ardent supporter of President Trump, much like his fellow conservative bar member, Ms. Conway, who Mr. Klayman knows quite well. Regrettably, during this polarized and highly charged period of

---

[4] Steven Lubet, *In Defense of Kellyanne Conway*, Slate, Feb. 27, 2017, available at: http://www.slate.com/articles/news_and_politics/jurisprudence/2017/02/the_misconduct_ complaint_against_kellyanne_conway_is_dangerously_misguided.html

American history, anyone who supports President Trump is generally considered and treated as "enemies" of liberal and Democrat activism and causes, as the President has been branded a female abuser, sexist, misogynist, and last but hardly least, a racist. This bias and thus mindset is clearly present with regard to the Defendants herein, several of whom have donated to politicians and political candidates who support these causes and who oppose and have vilified the President publically.

93.     Finally, at the hearing in the Sataki matter, Defendants, acting in concert, by and through Defendant Smith, openly admitted that their motivation in prosecuting bar complaints against Mr. Klayman is because he had filed large and complex lawsuits against Hillary Clinton, other Democrats, and other related parties, persons, and entities.

### FIRST CAUSE OF ACTION
#### *Abuse of Process*
#### Against All Defendants

94.     Mr. Klayman repeats and re-alleges all of the previous allegations of the entirety of this Complaint, including, but not limited to, the Introduction and the exhibits to this Complaint, with the same force and effect, as if fully set forth herein again at length.

95.     Defendants, each and every one of them acting in concert, have abused and perverted the Board of Professional Responsibility's process in initiating, furthering, and falsely deciding claims of misconduct in order to compel Mr. Klayman to be prevented and ultimately barred from practicing law due to Mr. Klayman's political beliefs, activism, free speech, and gender.

96.     As set forth previously, this concerted effort to disbar Mr. Klayman is evidenced by Defendant Smith's ridiculous and outrageous suggestion, on behalf of the other Defendants, that he accept disbarment, despite the fact that the hearing committee had only recommended a three-month suspension in the Judicial Watch matter.

97.     Defendants conduct is a deliberate misuse of the Board of Professional Responsibility's judicial process for all of the reasons set forth in this Complaint and its preceding paragraphs, as well as the exhibits hereto.

**SECOND CAUSE OF ACTION**
*Malicious Prosecution*
**Against All Defendants**

98.     Mr. Klayman repeats and re-alleges all of the previous allegations of the entirety of this Complaint, including, but not limited to, the Introduction and the exhibits to this Complaint, with the same force and effect, as if fully set forth herein again at length.

99.     Defendants had no reasonable basis in fact or law to file a Specification of Charges with the Board of Professional Responsibility, particularly after seven years if delay and after Ms. Sataki had abandoned her purported complaints, much less the clear and convincing evidence needed to substantiate their claims, yet proceeded to do so anyway due to Mr. Klayman's political beliefs, activism, speech, and gender.

100.    This is strongly evidenced by the fact that The Florida Bar and the Pennsylvania Bar both summarily dismissed identical claims filed on behalf of Ms. Sataki against Mr. Klayman because they were not based on fact or law.

101.    Defendant Herman, however, on behalf of herself and the other Defendants, acting in concert, "could care less" that these other Bars clearly and summarily found no misconduct, because their unethical, illegal, and unconstitutional agenda is to remove Mr. Klayman from the practice of law.

102.    Defendants acted maliciously in prosecuting Mr. Klayman, without probable cause, due solely to due to Mr. Klayman's political beliefs, activism, free speech, and gender.

**THIRD CAUSE OF ACTION**
*42 U.S.C. 1983 - Violation of Fourteenth Amendment Equal Protection*
**Against Defendants Fox, Herman, Smith, and Porter**

103.     Mr. Klayman repeats and re-alleges all of the previous allegations of the entirety of this Complaint, including, but not limited to, the Introduction and the exhibits attached to this Complaint, with the same force and effect, as if fully set forth herein again at length.

104.     The Individual Defendants, as attorneys employed by ODC, the chief prosecutor for attorney disciplinary matters involving active or inactive attorneys who are members of the D.C. Bar, at all relevant times were acting in concert under the color of state law.

105.     The Individual Defendants, acting in concert and conspiring in their individual capacities, outside of the scope of their official duties, conspired to violate Mr. Klayman's constitutional, statutory, and other common law rights, and did in fact violate those rights.

106.     Intentionally violating an individual's constitutional rights is not within the scope of the Individual Defendants' official duties.

107.     The Fourteenth Amendment to the Constitution prohibits states from denying any person within its territory equal protection of the laws.

108.     Under the color of state law, the Individual Defendants have deprived Mr. Klayman of his federal, constitutional right to equal protection under the laws by selectively prosecuting him for his gender, public interest advocacy, and free speech without a legitimate or any basis in fact or law.

### FOURTH CAUSE OF ACTION
*42 U.S. C. 1983 - Violation of First Amendment Protections*
**Against Defendants Fox, Herman, Smith, and Porter**

109.     Mr. Klayman repeats and re-alleges all of the previous allegations of the entirety of this Complaint, including, but not limited to, the Introduction and the exhibits attached to this Complaint, with the same force and effect, as if fully set forth herein again at length.

110.     The Individual Defendants as attorneys employed by ODC, the chief prosecutor for attorney disciplinary matters involving active or inactive attorneys who are members of the D.C. Bar, at all relevant times were acting in concert under the color of state law.

111.    The Individual Defendants, acting in concert in their individual capacities, outside of the scope of their official duties, conspired to violate Mr. Klayman's constitutional, statutory, and other rights, and did in fact violate those rights.

112.    Intentionally violating an individual's constitutional rights is not within the scope of the Individual Defendants' official duties.

113.    The First Amendment to the Constitution prohibits states and state entities and agencies from abridging freedom of speech.

114.    Under the color of state law, the Individual Defendants have deprived Mr. Klayman of his federal, constitutional right to freedom of speech by selectively prosecuting him without any basis in fact or law to remove him from the practice of law due to his politics, conservative activism, free speech, and gender.

115.    The Individual Defendants, acting in concert, are trying to unethically, unconstitutionally, and illegally attempt to disbar Mr. Klayman, so that he is no longer able to pursue his conservative, public interest work, in effect silencing his public interest activism and free speech in furtherance of removing Mr. Klayman from public discourse, as guaranteed by the First Amendment.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Klayman prays for relief and judgment against Defendants as follows:  actual, compensatory, and punitive damages in an amount to be determined by the trier of fact, as well as preliminary and permanent injunctive relief, attorney's fees and costs, and any other relief that this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all counts, as to all issues so triable.

DATED: July 3, 2018                                   Respectfully submitted,


                                                      /s/ Larry Klayman
                                                      _____
                                                      Larry Klayman, Esq.
                                                      KLAYMAN LAW GROUP, PA

c/o 7050 W. Palmetto Park Road
#15-287
Boca Raton, FL 33433
Email: leklayman@gmail.com
Tel: 561-558-5563
*Counsel for Plaintiff*